**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| U.H.A., K.A., M. DOE, H.D., D. DOE, *on behalf of themselves and others similarly situated*; and | Civil No. 26-417 (JRT/DLM) |
| THE ADVOCATES FOR HUMAN RIGHTS, | |
| Petitioner-Plaintiff and Plaintiffs, | |
| v. | |
| PAMELA BONDI, *Attorney General of the United States*; | |
| KRISTI NOEM, *Secretary of the United States Department of Homeland Security*; | **MEMORANDUM OPINION AND ORDER GRANTING MOTION FOR TEMPORARY RESTRAINING ORDER** |
| TODD M. LYONS, *Acting Director of the United States Immigration and Customs Enforcement*; | |
| DAVID EASTERWOOD, *Acting Director, St. Paul Field Office, U.S. Immigration and Customs Enforcement*; | |
| JOSEPH B. EDLOW, *Director, U.S. Citizenship and Immigration Services*, | |
| Defendants-Respondents. | |

E. Michelle Drake, John G. Albanese, Joseph C. Hashmall, Hans W. Lodge, Marika K. O'Connor Grant, Ariana Kiener, Bryan Plaster, Katherine Raths, Jordan C. Hughes, Soledad Slowing-Romero, **BERGER MONTAGUE PC**, 1229

Tyler Street Northeast, Suite 205, Minneapolis, MN 55413, for Petitioner-Plaintiff and Plaintiffs.

Ana H. Voss, **UNITED STATES ATTORNEY'S OFFICE**, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415; Jesus Cruz Rodriquez, **DEPARTMENT OF JUSTICE**, 7510 Northwest Tango Road, Suite D7, Lawton, OK 73503, for Defendants-Respondents.

This case squarely presents the issue of whether the United States Department of Homeland Security (DHS) has violated provisions of federal statute and longstanding agency practice by implementing a policy that involves arresting and detaining individuals who are lawful refugees in Minnesota. These individuals were admitted to the country, have followed the rules, and are waiting to have their status adjusted to lawful permanent residents of the United States.

In early January 2026, DHS and U.S. Citizenship and Immigration Services (USCIS) launched Operation Post-Admission Refugee Reverification and Integrity Strengthening ("Operation PARRIS"). The stated purpose of the program is to target and reexamine the legal status of Minnesota's 5,600 refugees who have not yet secured permanent resident status. Plaintiffs allege that since Operation PARRIS began, Defendants have implemented a practice of arresting and detaining—without notice or warrant—individuals previously screened and admitted into the United States as refugees. These refugees have undergone rigorous background checks and vetting, been approved by multiple federal agencies for entry, been given permission to work, received support from the government, and been resettled in the United States. Because of

2

conditions in their home countries, they have been deemed of special humanitarian concern to the United States.  None have been deemed a danger to the community or a flight risk.  None have been charged with any ground for removal.

Plaintiffs initiated this putative class action on behalf of Minnesota residents with refugee status who have been subjected to arrest and detention or fear that their arrest and detention is imminent.  Plaintiffs now move for a temporary restraining order (Docket No. 16.)  Because the *Dataphase* factors all weigh in favor of granting relief, the Court will issue a temporary restraining order: (1) enjoining Defendants from arresting or detaining any member of the putative class in Minnesota on the basis that they are a refugee who has not yet adjusted to lawful permanent resident status; and (2) ordering the immediate return and release of the members of a putative subclass consisting of those refugees who are presently detained under the policy.  The Court has ordered briefing and scheduled a preliminary injunction hearing to occur soon.  This Order is temporary and will remain in effect until the Court considers and rules on a preliminary injunction.

## BACKGROUND

### I.    FACTUAL BACKGROUND

On January 9, 2026, DHS and USCIS announced "Operation PARRIS."  (Class Action Compl. & Am. Pet. for Writ of Habeas Corpus ("Am. Pet.") ¶ 1, Jan. 24, 2026, Docket No. 12.)  According to USCIS's press release announcing the program, it is a "sweeping initiative" intended to reevaluate "thousands of refugee cases through new background

checks and intensive verification of refugee claims."[1]  (Declaration of E. Michelle Drake ("Drake Decl.") ¶ 17, Ex. 15, Jan. 24, 2026, Docket No. 16-19.)   The press release emphasizes that the "initial focus [of Operation PARRIS] is on Minnesota's 5,600 refugees who have not yet been given lawful permanent resident status (Green Cards)."  (*Id.*)

The Named Plaintiffs[2] are refugees who were lawfully admitted to the United States through the U.S. Refugee Admissions Program (USRAP) after completing the rigorous vetting process.  (Am. Pet. ¶ 9.) They are originally from Africa, Asia, or Latin America and reside in Minnesota.  (*Id.* ¶ 9.)  The Named Plaintiffs have not yet been adjusted to lawful permanent resident status and have not been charged with any ground for removal under the Immigration and Nationality Act.  (*Id.* ¶ 11.)  Nor have any of them been declared a danger or a flight risk.  (*Id.* ¶ 9.)

The facts provided by the Named Plaintiffs are illustrative of the effects of Defendants' new program.  Petitioner-Plaintiff U.H.A. is a refugee, admitted into the United States in 2024, who was arrested by ICE while driving to work on January 18, 2026. (*Id.* ¶ 15.)  He was pulled over, ordered out of his car, handcuffed, and detained, without a warrant or apparent justification.  (*Id.*)  U.H.A., who lives with his parents and siblings,

---

[1] *DHS Launches Landmark USCIS Fraud Investigation in Minnesota*, U.S. CITIZENSHIP AND IMMIGR. SERVS. (Jan. 9, 2026), https://www.uscis.gov/newsroom/news-releases/dhs-launches-landmark-uscis-fraud-investigation-in-minnesota.  (Filed at Docket No. 16-19.)

[2] For clarity, the Named Plaintiffs include Petitioner-Plaintiff U.H.A, but the Named Plaintiffs do not include Plaintiff the Advocates for Human Rights.

has no criminal history and has never been placed in removal proceedings.  (*Id.*)  Plaintiff

K.A., U.H.A.'s younger brother, is also a refugee.  (*Id.* ¶ 16.)  K.A. was driving behind U.H.A.

on their way to work on January 18 and witnessed his brother's arrest.  (*Id.*)  K.A. now

fears that he, too, will be arrested by ICE under Operation PARRIS.  (*Id.*)  He has not

returned home since that day, "[n]or has he ventured out to attend his college classes or

to buy groceries."  (*Id.*)  K.A., like his brother, has no criminal history.  (*Id.* ¶ 111.)  U.H.A.

remains in detention.  (*Id.* ¶ 110.)

Plaintiff H.D. is a refugee who applied to become a lawful resident in 2025 and also

fears leaving her home as a result of Operation PARRIS.  (*Id.* ¶ 17.)  ICE officers "came to

[H.D.'s] family home twice within a week and attempted to get her family to open the

door; fearful, they did not."  (*Id.*  ¶ 112.)  H.D. received a letter "instructing her to report

to an appointment at an ICE office for a case review interview"—but H.D. has a friend,

also a refugee, who "had applied for a green card," and was arrested by ICE at a case

review appointment.  (*Id.* ¶ 112.)  Fearful for her own liberty, H.D. did not attend.  (*Id.*)

"She secured a lawyer who attended on her behalf, but the ICE officer refused to

communicate with her lawyer."  (*Id.*)  H.D.'s "experience has caused her to relive similar

experiences of armed men knocking on her door in the country she fled."  (*Id.*)

D. Doe, a refugee, was at home with his family on January 11, 2026, when a man

in plain clothes knocked on the door.  (*Id.* ¶ 18.)  D. Doe answered the door, and the man

told him that he had hit D. Doe's car—but his description did not match D. Doe's car.  (*Id.*)

The man left, and returned a few minutes later, this time describing the correct car.  (*Id.*) D. Doe went outside to check the damage, when he was surrounded by armed men and arrested.  (*Id.*)  After being taken to a detention center in Minnesota, he was immediately flown to Texas, where he was interrogated about his refugee status.  (*Id.*)  He was kept in "shackles and handcuffs" for 16 hours.  (*Id.* ¶ 113.)  D. Doe was ultimately released on the streets of Texas, left to find his way back to Minnesota.  (*Id.* ¶ 18.)  After seeing her spouse arrested, Plaintiff M. Doe fears that she may be arrested and detained by ICE, and that both parents may be separated from their three-year-old son.  (*Id.* ¶ 19.)

Plaintiff the Advocates for Human Rights is a 501(c)(3) legal services nonprofit.  (*Id.* ¶ 115.)  They allege that their "core business activities have been significantly impacted" by Defendants' new policy, and that they have "been unable to assist clients that it would have ordinarily served" due to the need to "divert significant resources to representing refugees in habeas proceedings."  (*Id.*)

## II.    PROCEDURAL BACKGROUND

This case began on January 18, 2026, when Petitioner-Plaintiff U.H.A. filed a Verified Petition for Writ of Habeas Corpus following his arrest and detention under Operation PARRIS.  (Docket No. 1.)  Defendants timely filed their answer on January 21, (Docket No. 5), and U.H.A. replied (Docket No. 11).

On January 24, 2026, U.H.A, K.A., H.D., D. Doe., M. Doe., and The Advocates for Human Rights (collectively, "Plaintiffs") filed a Class Action Complaint and Amended Petition for Writ of Habeas Corpus (Docket No. 12), alleging that Defendants' policy of

arresting and detaining unadjusted refugees through the implementation of Operation PARRIS violates the Administrative Procedure Act, the *Accardi* Doctrine, and the Fourth and Fifth Amendments of United States Constitution.[3]

At the same time as the Amended Petition, Plaintiffs filed several additional motions.[4]  Two require discussion in this Order.   First, Plaintiffs seek a temporary restraining order.  They ask the Court to: (1) postpone the effective date of the "Refugee Detention Policy" Defendants have employed in furtherance of Operation PARRIS;[5] (2) enjoin Defendants from arresting or detaining any member of the putative Class on the basis that they are an unadjusted refugee; and (3) order that a subgroup of putative class

---

[3] Under 28 U.S.C. § 2242, an application for a writ of habeas corpus "may be amended or supplemented as provided in the rules of procedure applicable to civil actions."   Under Rule 15(a)(1) of the Federal Rules of Civil Procedure, "[a] party may amend its pleading once as a matter of course [within] . . . 21 days after serving it, or if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading . . . whichever is earlier." Regardless of whether Defendants' response is considered a responsive pleading, Plaintiffs filed their Amended Petition within the deadline set forth in Rule 15.  Therefore, the Court concludes that the Amended Petition may be considered.

[4] (1) Motion for Entry of Preliminary Protective Order (Docket No. 13); (2) Motion for Leave to Proceed Under Pseudonyms and to Seal (Docket No. 14); (3) Motion for Rule 23(b)(2) Class Certification (Docket No. 15); and (4) Motion for Temporary Restraining Order and Immediate Postponement of Agency Action (Docket No. 16).

[5] Plaintiffs define the "Refugee Detention Policy" as Defendants' policy "that would subject *all* lawfully present refugees who have not yet obtained lawful permanent resident status ("LPR") status to arrest and mandatory detention after being present in the United States for one year—even though refugees cannot adjust to LPR status until the one-year mark[.]"  (Pls.' Mem. Supp. Mot. for TRO at 10, Jan. 24, 2026, Docket No. 16-2.)  For ease and consistency, the Court will refer to DHS's new policy as the "Refugee Detention Policy."

plaintiffs who are presently detained under Operation PARRIS be immediately released from custody. (Pls.' Mem. Supp. Mot. for TRO at 50, Jan. 24, 2026, Docket No. 16-2.)

Second, Plaintiffs seek to certify a class and a subclass under Federal Rule of Civil Procedure Rule 23(b)(2). Plaintiffs request certification of a "Class" of "[a]ll individuals with refugee status who are residing in the state of Minnesota who have not yet adjusted to lawful permanent resident status and have not been charged with any ground for removal under the [Immigration and Nationality Act]." (Pls.' Mot. for Rule 23(b)(2) Class Cert. at 2, Jan. 24, 2026, Docket No. 15.) Plaintiffs also request certification of a "Detained Subclass," which would consist of "[a]ll members of the Class who are or will be detained by DHS pursuant to the Refugee Detention Policy." (*Id.*)

## DISCUSSION

## I.    MOTION FOR TEMPORARY RESTRAINING ORDER

### A.    Standard of Review

The purpose of a temporary restraining order or preliminary injunctive relief is to maintain the status quo. *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 664 (8th Cir. 2022). Courts in the Eighth Circuit evaluate a motion for a TRO or preliminary injunction under the four *Dataphase* factors: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm injunctive relief would cause to the other litigants; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en

banc).  The party seeking temporary injunctive relief has the burden of proving all four *Dataphase* factors.  *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

When applying these factors, "a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene."  *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999) (quoting *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998)).  That said, injunctive relief is an extraordinary remedy, and the moving party has the burden of establishing the propriety of an injunction.  *Watkins Inc.*, 346 F.3d at 845.

### B.   Likelihood of Success on the Merits

For temporary relief to be warranted here, Plaintiffs must show that they are likely to succeed on the merits of their claim.  *Mid-Am. Real Est. Co. v. Iowa Realty Co.*, 406 F.3d 969, 972 (8th Cir. 2005) ("[A]n injunction cannot issue if there is no chance of success on the merits.").  However, the question is not whether the movant has "prove[d] a greater than fifty per cent likelihood that [they] will prevail," *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007), but whether any of their claims provide a "fair ground for litigation," *Watkins*, 346 F.3d at 844.  "In considering the likelihood of the movant prevailing on the merits, a court does not decide whether the movant will ultimately win." *PCTV Gold*, 508 F.3d at 1143.  Rather, the movant must show that they have a "fair chance of prevailing" on their claims.  *Planned Parenthood Minn., N.D., S.D. v. Rounds*,

530 F.3d 724, 732 (8th Cir. 2008).  While no single factor is determinative, likelihood of success on the merits is often considered the most significant of the *Dataphase* factors.  *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013).

### 1.    Statutory and Regulatory Backdrop

This case involves a stark shift in Defendants' treatment of individuals who have been admitted to the United States as "refugees," replacing prior agency policy with abrupt arrest and detention—often without a warrant or notice.  Preliminary consideration of the lawfulness of this practice requires the Court to consider the unique legal status refugees hold within the United States immigration system.

A refugee is an individual "who is unable or unwilling to return to . . . [their country of origin] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . ."  8 U.S.C. § 1101(a)(42).  Refugees may be admitted to the United States only after rigorous screening and vetting procedures.  *See* 8 U.S.C. § 1157.[6]  To be considered for refugee resettlement in the United States, an individual must be referred to the USRAP, an interagency initiative involving multiple governmental and nongovernmental entities, including the Department of State, the Department of Homeland Security, the United Nations High Commissioner for Refugees, the Department of Health and Human

---

[6] USCIS, *Refugees*, https://www.uscis.gov/humanitarian/refugees-and-asylum/refugees (last visited Jan. 25, 2026).

Services' Office of Refugee Resettlement, Resettlement Support Centers, and the International Organization for Migration.[7] After a refugee applicant is referred, they must undergo extensive security screening conducted by multiple federal agencies, including the National Counterterrorism Center, the FBI's Terrorist Screening Center, the Drug Enforcement Agency, the Department of Defense, and others.[8] An applicant's biometric and biographic information is screened against numerous databases, including the Consular Lookout and Support System and other intelligence community systems.[9] After conducting the biometric and biographic checks, USCIS conducts an interview to gather information about whether the individual is eligible for refugee status.[10] Once conditionally approved, applicants must complete a medical examination and complete a cultural orientation program.[11]

---

[7] USCIS, *The United States Refugee Admissions Program (USRAP) Consultation and Worldwide Processing Priorities,* https://www.uscis.gov/humanitarian/refugees-and-asylum/usrap (last visited Jan. 26, 2026).

[8] USCIS, *Refugee Processing and Security Screening*, https://www.uscis.gov/humanitarian/refugees-and-asylum/refugees/refugee-processing-and-security-screening (last visited Jan. 26, 2026).

[9] *Id*.

[10] *Id*.

[11] USCIS, *United States Refugee Admissions Program (USRAP)*, https://www.uscis.gov/sites/default/files/document/charts/USRAP_FlowChart.pdf (last visited Jan. 26, 2026).

Applicants are then matched with a local resettlement agency in the United States.[12]  Before traveling to the United States, applicants are subject to additional security screening.[13]  Upon arrival, applicants are inspected by U.S. Customs and Border Protection, and if eligible, admitted into the United States.[14]

Once admitted, refugees are automatically authorized to work.  8 C.F.R. § 274a.12(a)(3).  They are also eligible for resettlement assistance, which provides refugees access to housing, food, clothing, orientation programs, English-language instruction, employment training, and medical and social services.[15]  The stated purpose of providing this assistance is to help refugees "become effectively resettled as quickly as possible."  8 U.S.C. § 1522(a).

An individual with conditional refugee status is considered to have been "admitted."  *Matter of D-K-*, 25 I. & N. Dec. 761, 769 (B.I.A. 2012) (concluding that "an alien admitted to the United States as a refugee has been 'admitted' for the purposes of [8 U.S.C. § 1101(a)(13)(A)] of the Act").  However, under the statutory framework, a refugee's conditional admission may ultimately result in two "admissions."  *Id.* at 768.

---

[12] *Id.*

[13] *Id.*

[14] *Id.*

[15] USCIS, *United States Refugee Admissions Program (USRAP)*, https://www.uscis.gov/sites/default/files/document/charts/USRAP_FlowChart.pdf (last visited Jan. 26, 2026); 8 U.S.C. § 1522.

The first is the initial conditional admission; the second occurs when the refugee is adjusted to lawful permanent resident ("LPR") status.  *Id.* (noting "that a refugee who ultimately becomes a lawful permanent resident will have been 'admitted' twice—first, upon conditional admission [under 8 U.S.C. § 1157] and second, upon reinspection and adjustment to permanent resident status under [8 U.S.C. § 1159.]").

After either of these admissions, Congress has imposed restraints on the government's authority to commence removal proceedings.  That is, a refugee may only be removed based on the grounds of **deportability** under 8 U.S.C. § 1227 but may not be removed under grounds of **inadmissibility** under 8 U.S.C. § 1182.  *Matter of D-K-*, 25 I. & N. Dec. at 768 (acknowledging that, once conditionally admitted or adjusted to LPR status, the individual is "subject to charges under only the deportability grounds, and not the grounds of inadmissibility.").  A refugee may also be removed after committing serious crimes.  *See, e.g.*, *Xiong v. Gonzales*, 484 F.3d 530, 533–34 (8th Cir. 2007).  However, ICE's longstanding agency guidance has been that failure to obtain LPR status, by itself, is not grounds for removal **nor is it a "proper basis for detaining them**."  U.S. Immigr. & Customs Enf't*, Memorandum on Detention of Refugees Admitted Under INA § 207 Who Have Failed to Adjust to Lawful Permanent Resident Status* at 2 (May 10, 2010) ("2010 ICE Guidance")[16]; *see also Liban G. v. Noem*, Civ. No. 26-301, 2026 WL 125689, at *2 (D. Minn. Jan. 16, 2026).  Indeed, this guidance states that if "an unadjusted refugee [is arrested]

---

[16] (Drake Decl. ¶ 18, Ex. 16, Docket No. 16-20.)

upon reasonable belief of removability," the government must decide **within 48 hours** of the arrest, whether to release the refugee or to commence removal proceedings by issuing a Notice to Appear. (2010 Ice Guidance at 2.) But "[i]f it becomes apparent earlier that no removability ground applies, the individual must be released promptly." (*Id.*)

An individual designated as a refugee may also be subject to removal if the individual is later found not to meet the definition of a "refugee" under 8 U.S.C. § 1101(a)(42) . *See* 8 U.S.C. § 1157(c)(4). If USCIS determines that the noncitizen was not a "refugee," regulations require USCIS to provide the noncitizen written notice of its intent to terminate the noncitizen's refugee status. 8 C.F.R. § 207.9. The noncitizen then has 30 days to respond. *Id.*

Once an individual has been admitted as a refugee under § 1157, has been physically present in the United States for over a year, but has not been adjusted to LPR status, they must "at the end of such year, return or be returned to the custody of the Department of Homeland Security for inspection and examination for admission to the United States as an immigrant in accordance with the provisions of sections 1225, 1229a, and 1231 of this title." 8 U.S.C. § 1159(a)(1). DHS guidance provides a 48-hour timeline for inspection and examination.[17]

---

[17] *See* 2010 ICE Guidance at 3 ("If a determination to place an unadjusted refugee in removal proceedings has not been made within the initial 48-hour period . . . the [Detention and Removal Operations] Field Office should release the alien with a reminder that the INA imposes an obligation upon him or her to apply for adjustment of status under section 209(A) and to provide DHS with updated address information[.]").

Three aspects of § 1159 warrant emphasis before the Court returns to the facts of the present case.

**First**, the statute requires refugees who have resided in the United States for more than one year to submit to DHS for inspection and examination. However, as this Court has noted, § 1159 "permits custody for a specific and limited function: to allow DHS to conduct the inspection necessary to adjudicate adjustment of status under § 1159(a)(2)." *E.E. v. Bondi*, Civ. No. 26-314, at 7 (D. Minn. Jan. 17, 2026). Federal regulations governing the adjustment of status of refugees indicate that § 1159's "inspection and examination" requirement contemplates a limited encounter, not prolonged detention. *See* 8 C.F.R § 209.1(b), (d) (requiring refugees to submit an application for adjustment to LPR status one year after entry with biometric information and providing that USCIS will decide on a case-by-case basis whether an interview with an immigration officer is required to determine eligibility for LPR status).

**Second**, detention of a refugee after "inspection and examination" is subject to §§ 1225, 1229a, and 1231. Section 1225 provides for mandatory detention for certain inadmissible "arriving aliens," § 1225(b)(1), and noncitizens deemed "applicants for admission" that are "seeking admission," § 1225(b)(2). Section 1229a governs removal proceedings. Under § 1231, an alien subject to a final order of removal must be detained during the 90-day removal period, which generally starts when the order becomes administratively final. *Id.* § 1231(a)(1)(A)–(B), (a)(2)(A). After the 90-day removal period

ends, the noncitizen may be detained if determined "to be a risk to the community or unlikely to comply with the order of removal." *Id.* § 1231(a)(6).

**Third**, refugees who meet the statutory requirements to obtain lawful permanent resident status are entitled to that status. *See* 8 U.S.C. § 1159(a)(2) ("Any [individual] who is found upon inspection and examination by an immigration officer . . . to be admissible . . . shall, notwithstanding any numerical limitation . . . be regarded as lawfully admitted to the United States for permanent residence").

### 2.    Lawfulness of Defendants' Refugee Detention Policy

After careful review of the limited record before the Court, the Court concludes that Plaintiffs are likely to succeed on the merits of their claim.  The Court concludes that federal statutes governing refugees and immigrant detention do not permit prolonged detention of unadjusted refugees who have not been charged with any ground of removability.[18]  Plaintiffs are therefore likely to prevail on their claim that they are entitled to a judgment that their arrest and detention, and the policy that purports to justify them, are unlawful.

Here, the Named Plaintiffs are refugees who have not yet adjusted to lawful permanent resident status and who have not been charged with any ground of

---

[18] Before Plaintiffs filed their Amended Petition, Defendants responded to U.H.A.'s petition for habeas corpus and asserted that because U.H.A. was a refugee and had resided in the United States for over a year, Petitioner was subject to mandatory detention under 8 U.S.C. § 1159(a)(1)(C).  (Resp. Pet. for Writ of Habeas Corpus, at 2, Jan. 21, 2026, Docket No. 5).  The Defendants also argued that U.H.A. was subject to mandatory detention under § 1225(b)(2).

removability under the INA; nor has any Named Plaintiff been determined to pose a danger to the community or a risk of flight.  (Am. Pet. ¶¶ 9, 11.)[19]  Although § 1159 contemplates that a refugee may be returned to DHS "custody" on a limited basis solely to enable inspection and examination for admission by the government, any continued detention must be based on §§ 1225, 1229a, or 1231.  8 U.S.C. § 1159(a)(1); *see Jama A.O. v. Bondi*, Civ. No. 26-420, at 7 (D. Minn. Jan. 23, 2026).  On the plain reading of these statutes, the Court concludes that none of these provisions authorize the prolonged detention of the Named Plaintiffs—or, as discussed below, the putative Class or Detained Subclass—because neither §§ 1225, 1229a, nor 1231 provide any basis for their detention.  Section 1225 does not apply because the Plaintiffs were conditionally admitted as a refugee, and therefore, they are neither "arriving aliens" nor "applicants for admission."  Section 1229a does not apply because these individuals have not been placed in removal proceedings.  Section 1231 does not apply because these individuals have not been ordered removed.[20]

---

[19] Plaintiffs also request certification of a "Class" of "[a]ll individuals with refugee status who are residing in the state of Minnesota who have not yet adjusted to lawful permanent resident status and have not been charged with any ground for removal under the INA."  (Pls.' Mot. for Rule 23(b)(2) Class Cert. at 2.)  Plaintiffs also request certification of a "Detained Subclass," which would consist of "[a]ll members of the Class who are or will be detained by DHS pursuant to the Refugee Detention Policy."  (*Id.*)  Although the Court will not certify the putative class at this stage of the proceedings, the Court will address the scope of the relief granted here below.

[20] 8 U.S.C. § 1226(c) imposes mandatory detention on a defined group of noncitizens, comprising of noncitizens who fall within "enumerated categories involving criminal offenses and terrorist activities."  *Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018).  Because the Named

To the extent Defendants' Refugee Detention Policy is premised on § 1159(a)'s language directing that unadjusted refugees who have resided in the country longer than one year "be returned to the **custody** of the Department of Homeland Security for inspection and examination," the Court finds that Defendants' interpretation of the word "custody" is unlikely to prevail for at least four reasons.

**First**, the phrase "custody" in the statute is limited to a simple, narrow purpose: conducting "inspection and examination for admission to the United States as an immigrant[.]" 8 U.S.C. § 1159(a)(1)(C); *see Amin A. v. Trump*, Civ. No. 26-251, Docket No. 11, at 4 (D. Minn. Jan. 26, 2026). In the context of that limited purpose, "custody" is best read to mean "responsibility" or "control," rather than prolonged detention. *See Custody*, Black's Law Dictionary (12th ed. 2024) (defining custody as, among other things, "responsibility for taking care of" and "[t]he care and control of a thing"). That is, § 1159 contemplates that a refugee be returned, temporarily, to the control of DHS because they have the responsibility to inspect and examine the refugee for admission.

**Second**, ICE's own prior guidance interpreting these provisions has instructed officers that individuals who have not yet applied for adjustment to LPR status cannot be detained on that basis alone. (2010 ICE Guidance at 2.)

---

Plaintiffs, putative Class, and putative Detained Subclass have not committed any of the enumerated crimes, mandatory detention under § 1226(c) is not appropriate.

18

**Third**, the Supreme Court has interpreted 8 U.S.C. § 1182(d)(5)(A)—which contains nearly identical "be returned to custody" language—to not authorize detention. *See Clark v. Martinez*, 543 U.S. 371, 386 (2005) (interpreting the phrase "be returned to the custody" under § 1182(d)(5)(A) and concluding that "nothing in this text . . . affirmatively authorizes detention, much less indefinite detention").

**Fourth**, interpreting the phrase "be returned to the custody" in § 1159(a) as mandating detention would lead to an illogical result. Because § 1159(a) makes refugees ineligible for adjustment until one year after entry, Defendants' interpretation would subject **every** refugee to detention, **unless** USCIS conducted the inspection and examination precisely at the one-year mark. That outcome is nonsensical and would cause many unadjusted refugees to celebrate their one-year anniversary in this country in a jail cell. For these reasons, the argument that § 1159(a) mandates detention for unadjusted refugees is unlikely to prevail.

Because 8 U.S.C. § 1159 does not authorize prolonged detention of unadjusted refugees, and because the Named Plaintiffs, the putative Class, and the putative Detained Subclass are not subject to detention under §§ 1225, 1229a, or 1231, Plaintiffs have shown a likelihood of success on their claim that Defendants lack lawful authority to detain them. Section 1159 permits the inspection and examination necessary to adjudicate refugees' adjustment of status applications—nothing more. Plaintiffs are

therefore likely entitled to a judgment that Defendants' Refugee Detention Policy under "Operation PARRIS" violates federal law.[21]

### C.    Threat of Irreparable Harm

The Court next must consider the threat of irreparable harm. "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). "To succeed in demonstrating a threat of irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (internal quotation marks omitted).

The Court finds that the threat of irreparable harm favors immediate relief in this case. The stories of terror and trauma recounted by Named Plaintiffs in their Amended Petition make this harm impossible to ignore. Plaintiffs U.H.A. and D. Doe were arrested and detained by ICE despite their refugee status—a status they obtained due to a well-founded fear of persecution in the country from which they came. Plaintiffs allege that "more than a hundred refugees who fled persecution in their home countries," have been

---

[21] In the alternative, while the Court will not engage in a robust analysis of these issues here, the Court also finds Plaintiffs' constitutional claims—specifically, that the sudden, warrantless arrests of individuals under Operation PARRIS violate Plaintiffs' liberties guaranteed by the Fourth and Fifth Amendments—to be weighty and persuasive.

arrested and detained, without notice or warrants, including being "handcuffed and shackled in chains for prolonged periods, causing unnecessary physical pain."  (Am. Pet. ¶ 108.)  Once detained, they have been "provided no information about why they are being detained or when they will be released."  (*Id.*)

The loss of liberty is "perhaps the best example of irreparable harm."  *See Matacua v. Frank*, 308 F. Supp. 3d 1019, 1025 (D. Minn. 2018); *see also Hamdi v. Rumsfeld*, 542 U.S. 531 (2004) (describing the right to be "free from physical detention by one's own government," as "the most elemental of liberty interests.").  And the threat of harm here does not stop with the deprivation of liberty.  Defendants have also hurriedly transported detained refugees (alongside many other individuals detained by federal officials in Minnesota in recent months) to distant states, often without the ability to communicate with counsel, family, or the community.  In addition, the federal government, including the Department of Justice, has repeatedly "failed to comply" with "dozens of court orders," from judges in this District, including orders requiring the immediate release and return to Minnesota of unlawfully detained individuals; indeed, "**the extent of ICE's violation of court orders**" has been "**extraordinary**."  *Juan T.R. v. Noem*, Civil No. 26-107, Docket No. 7 at 2–3 (D. Minn. Jan. 26, 2026) (emphasis added).  The threat of prolonged, unauthorized, and seemingly unaccountable detention has caused additional "significant hardship" to those subject to these actions.  *Id.*

Named Plaintiffs who have not—yet—been arrested under Defendants' policy have also demonstrated an imminent threat of irreparable harm because Operation PARRIS was specifically crafted by Defendants with the purpose of targeting "Minnesota 5,600 refugees who have not yet been given lawful permanent resident status (Green Cards)."  (Drake Decl. ¶ 17, Ex. 15, Docket No. 16-19.)  Even refugees who have been detained and released, or who hold the legal status targeted by Defendants but have not yet been arrested, face a legitimate threat of irreparable harm absent immediate relief, and possess a rational and completely understandable fear that they may be arrested or re-arrested.  Because Plaintiffs have demonstrated a threat of irreparable harm, the Court finds that this *Dataphase* factor strongly favors Plaintiffs.

### D.    Balance of Harms and Public Interest

The third and fourth factors that consider harm to the opposing party and the public interest merge when the Government is a party.  *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1019 (8th Cir. 2023) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  "When applying this factor, the key question is whether the movant's likely harm without a preliminary injunction exceeds the nonmovant's likely harm with a preliminary injunction in place."  *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1347 (8th Cir. 2024).

This factor likewise favors Plaintiffs.   The Court clearly recognizes the Government's significant and strong interest in enforcing its immigration laws.[22]  But, at the same time, the Government has "no public interest in perpetuating unlawful agency action."  *Missouri v. Trump*, 128 F.4th 979, 997 (8th Cir. 2025) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.D.C. Cir. 2016).  To the extent the Government has an interest in carrying out Operation PARRIS, these interests clearly do not outweigh Plaintiffs' interests in being free from unlawful detention.  *See Francisco T. Bondi*, 797 F. Supp. 3d 970, 776 (D. Minn. 2025) ("[P]reventing unlawful detention is a compelling issue of public importance.").[23]   Indeed, the Government's need to enforce a resource-intensive Refugee Detention Policy by arresting refugees likely interferes with the lawful need to enforce serious violations of immigration laws.

In sum, the Court finds that the *Dataphase* factors weigh in favor of granting Plaintiffs' motion for temporary restraining order.[24]  Plaintiffs have shown that they are

---

[22] *United States v. Arango*, No. 09-178, 2015 WL 11120855, at *2 (D. Ariz. Jan. 7, 2015) (finding that the "Government's interest in enforcing immigration laws is enormous").

[23] On January 20, 2025, President Trump issued an executive order, titled "Realigning the United States Refugee Admission Program."  *See* Exec. Order No. 14163, 90 Fed. Reg. 8459 (Jan. 20, 2025).  The order indefinitely suspended both "entry into the United States of refugees under USRAP" and "decisions on applications for refugee status."  *Id.*  The Court's conclusions regarding the lawfulness of Defendants' Refugee Detention Policy in Minnesota have no bearing whatsoever on the question of the lawfulness of President Trump's refugee suspension.

[24] The Court will waive the bond requirement under Federal Rule of Civil Procedure 65(c) because TRO seeks to prevent constitutional violations and the Defendants would not incur monetary damages due to a wrongfully issued TRO.  *See Liban G. v. Noem*, Civ. No. 26-301, 2026 WL 125689, at *3 n.1 (D. Minn. Jan. 16, 2026).  This matter also implicates significant public

likely to succeed on their claim that Defendants' Refugee Detention Policy—which is effectuated in furtherance of Operation PARRIS—violates the Immigration and Nationality Act; have shown a significant threat of irreparable harm; and have shown that the balance of harms as between the Plaintiffs and Defendants favors Plaintiffs. The Court will therefore grant temporary injunctive relief.

## II.    SCOPE OF RELIEF

The Named Plaintiffs assert claims not only on behalf of themselves as individuals, but they also seek to represent a class (and one subclass) of similarly situated individuals under Federal Rule of Civil Procedure Rule 23(b)(2).   Plaintiffs seek to certify a "Class" defined as "[a]ll individuals with refugee status who are residing in the state of Minnesota who have not yet adjusted to lawful permanent resident status and have not been charged with any ground for removal under the INA."  (Pls.' Mot. for Rule 23(b)(2) Class Cert. at 2.)  And Plaintiffs move to certify a "Detained Subclass," which consists of "[a]ll members of the Class who are or will be detained by DHS pursuant to the Refugee Detention Policy."  (*Id.*)

Although Plaintiffs move for class certification (Docket No. 15), the Court will defer ruling on Plaintiffs' motion until the motion has been fully briefed and heard.  The Court

---

interests.  *See, e.g.*, *Richland/Wilken Joint Powers Auth. V. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016).

will, however, consider whether temporary injunctive relief on a putative class-wide basis

is appropriate by evaluating the issue through the lens of Rule 23.

**A.    Standard of Review**

"[C]ourts may issue temporary relief to a putative class." *Tincher v. Noem*, No. 26-

1105, 2026 WL 194768, at *1 (8th Cir. Jan. 26, 2026) (quoting *A.A.R.P. v. Trump*, 605 U.S.

91, 98 (2025). In other words, the Court need not certify a class before issuing temporary

injunctive relief that applies beyond the named parties to the present case. *Id.* ("[W]e

need not decide whether a class should be certified as to the detainees' due process

claims in order to temporarily enjoin the Government from removing putative class

members while the question of what notice is due is adjudicated."). Nevertheless, the

Court will explain why temporary relief on a putative class-wide basis is appropriate

through an analysis of Federal Rule of Civil Procedure 23.

To certify a class, Plaintiffs must demonstrate compliance with Federal Rule of Civil

Procedure 23.[25] Rule 23 sets forth more than "a mere pleading standard." *Comcast Corp.*

*v. Behrend*, 569 U.S. 27, 33 (2013). Rather, Plaintiffs must provide evidentiary proof of

each of Rule 23's elements. *Id.* It is the Court's duty to conduct a rigorous analysis before

certifying a class, which necessarily requires that the Court consider some issues that bear

on the merits of a claim. *Id.* at 33–34. But courts considering class certification are not

---

[25] Class actions in habeas cases are permitted in the Eighth Circuit. *See Williams v. Richardson*, 481 F.2d 358, 361 (8th Cir. 1973).

expected to resolve questions regarding the merits. *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 459–60 (2013). First, Plaintiffs must show that they meet the requirements of Rule 23(a). Then, they must satisfy one of the three 23(b) categories.

### B.    Rule 23(a)

A Court considering whether to certify a class first assesses whether the class satisfies the requirements of Rule 23(a). *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1119 (8th Cir. 2005). These requirements are: (1) the class is so numerous that joinder of all members is impractical ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"); and (4) the representative parties will fairly and adequately protect the interests of the class ("adequacy"). Fed. R. Civ. P. 23(a). The Court will address each prong in turn.

**First**, Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a). A putative class size of forty or more will generally support a finding of numerosity, but the Eighth Circuit has occasionally certified classes with less than forty members. *Portz v. St. Cloud State Univ.,* 297 F. Supp. 3d 929, 944 (D. Minn. 2018). This element is easily satisfied as Operation PARRIS targets thousands of unadjusted refugees in Minnesota.

**Second**, Rule 23(a)(2) requires that there be questions of law or fact that are common to the class. Fed. R. Civ. P. 23(a)(2). To establish commonality under Rule 23(a)(2), class claims "must depend upon a common contention" that is "capable of

classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  The "commonality" element is clearly met here because the question of whether Defendants' policy of arresting and detaining refugees who have not yet obtained lawful permanent resident status is unlawful is a narrow, clear, common question of law or fact that applies equally to the Named Plaintiffs, putative Class, and putative Detained Subclass.  Therefore, the legal issues presented are especially suited to class-wide resolution.

**Third**, Rule 23(a)(3)'s typicality requirement requires the Court to consider if the claims or defenses of the representative parties are typical of the claims or defenses of the class.  Fed. R. Civ. P. 23(a)(3).  To establish typicality, the Court must determine "whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982).  Here, the same Refugee Detention Policy that appears to likely to violate Named Plaintiffs' rights is—for the simple reason that they fit the express criteria put forth in Defendants' rationale for the policy—almost certain to violate the other class members' rights.  Like other members of the Class, Plaintiffs K.A., H.D., D. Doe, and M. Doe, are all at risk of arrest and detention under the Refugee Detention Policy.  And like the Detained Subclass members, Plaintiff U.H.A. is being detained as a result of the Refugee Detention Policy.

**Fourth,** the Court must decide whether the proposed representatives and counsel will "fairly and adequately protect the interests of the Class." Fed. R. Civ. P. 23(a)(4). The adequacy inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). After considering the limited record at this stage, the Court finds that this element is met as the Court is unaware of any conflicts of interest.

Accordingly, based on the limited record before the Court at this stage of the proceeding, it appears likely that Plaintiffs will ultimately satisfy Rule 23(a)'s requirements.

### C.   Rule 23(b)

The Court must also decide whether the proposed class falls within one of the three categories of Rule 23(b). Rule 23(b)(2) is satisfied if a party shows that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011). The rule is particularly appropriate in civil rights actions. *See Coley v. Clinton*, 635 F.2d 1364, 1378 (8th Cir. 1980). Here, Plaintiffs allege that Defendants have acted on grounds that apply generally to the putative Class and the Detained Subclass by adopting a policy of targeting Minnesota's 5,600 unadjusted refugees for arrest and detention. *See Mercado v. Noem*, 800 F. Supp.

28

3d 526, 564 (S.D.N.Y. 2025) (provisionally certifying Rule 23(b)(2) class of immigrants detained by ICE, explaining that "defendants have acted on grounds generally applicable to the class—subjecting them to the same set of policies governing their confinement and access to attorneys—thereby making appropriate final injunctive relief with respect to the class as a whole").

### D.    Application of this Order

The Court will not rule on Plaintiffs' motion for class certification at this time. However, under the Supreme Court's decision in *A.A.R.P.*, the Court need not certify a class in order to grant temporary relief to a putative class. *See A.A.R.P.*, 605 U.S. at 98. The Court merely analyzed this case through the lens of Rule 23 above to show the appropriateness of granting temporary relief at this time.

In sum, the Court finds that temporary relief on a class-wide basis is justified based on the *Dataphase* factors and its brief review of Rule 23's requirements. The Court will incorporate Plaintiffs' proposed class definitions and grant Plaintiffs' motion for a temporary restraining order, as set forth below.[26]

---

[26] After Plaintiffs filed their TRO motion, they submitted a supplemental memorandum and a supplemental proposed order addressing Defendants' alleged misconduct during the "inspection and examination" interview conducted under 8 U.S.C. § 1159(a)(1)(C). (Pls.' Supp. Mem., Jan. 25, 2026, Docket No 19.)  At this stage in the proceedings, the Court declines to adopt Plaintiffs' proposed order language because it merely directs Defendants to "obey the law," which is impermissible. *Tincher v. Noem*, No. 26-1105, 2026 WL 194768, at *1 (8th Cir. Jan. 26, 2026).

**CONCLUSION**

It is important to note that this Order does not affect USCIS's responsibility to conduct reinspections to adjust refugees' status to lawful permanent resident. In Minnesota, USCIS may continue this statutory process but without arresting and detaining refugees. The Order also does not impact DHS's lawful enforcement of immigration laws. This Order is temporary until the Court has had the opportunity to have full briefing and argument on a motion for a preliminary injunction.

It is also essential to emphasize that the refugees impacted by this Order are carefully and thoroughly vetted individuals who have been invited into the United States because of persecution in the countries from which they have come. They are not committing crimes on our streets, nor did they illegally cross the border. Refugees have a legal right to be in the United States, a right to work, a right to live peacefully—and importantly, a right not to be subjected to the terror of being arrested and detained without warrants or cause in their homes or on their way to religious services or to buy groceries. At its best, America serves as a haven of individual liberties in a world too often full of tyranny and cruelty. We abandon that ideal when we subject our neighbors to fear and chaos.

The Court expects that this Order will be complied with in all respects.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiffs' Motion for Temporary Restraining Order (Docket No. [16]) is **GRANTED** as follows:

1. For the purposes of this Order, temporary relief is granted to a putative "**Class**" which encompasses: "All individuals with refugee status who are residing in the state of Minnesota, who have not yet adjusted to lawful permanent resident status, and have not been charged with any ground for removal under the Immigration and Nationality Act."

2. Defendants are **ENJOINED** from arresting or detaining any member of the **Class** on the basis that they are a refugee who has not been adjusted to lawful permanent resident status.

3. For the purposes of this Order, relief is granted to a putative "**Detained Subclass**" which encompasses: "All members of the Class who are or will be detained by DHS pursuant to the Refugee Detention Policy."

4. Defendants are **ORDERED** to immediately release all members of the Detained Subclass.

5. If a member of the Detained Subclass has been transferred out of the District of Minnesota, Defendants shall immediately **TRANSPORT** such member to Minnesota and **then RELEASE** such member from custody **within 5 days** of the date of this Order.  They shall not be released at the out-of-District location of detention.

6. Given the severe weather conditions in Minnesota, Defendants are **ORDERED** coordinate with Plaintiffs' counsel to ensure that upon such members' release, they are not left outside in dangerous cold.  In order to ensure humane treatment, Detained Subclass members must be released to counsel or to individuals specifically authorized by counsel.

7. Within **7 days** of this Order, Defendants shall file on the docket a status update concerning the status of the Detained Subclass members' release.

8. Within **48 hours** of this Order, Defendants shall produce and file under seal a list of individuals in detention that satisfy that definition of the putative Detained Subclass, as set forth in Paragraph 3 of this Order.  The list must disclose the individuals' identities and their location of detention.

9. Plaintiffs are not required to provide security under Federal Rule of Civil Procedure 65(c).

10. Defendants' Response concerning a preliminary injunction is due February 9, 2026; Plaintiffs' Reply is due February 13, 2026. The hearing on the motion for a preliminary injunction will be scheduled on February 19, 2026 at 2:00 p.m. in Courtroom 14E.


DATED: January 28, 2026
at Minneapolis, Minnesota.

JOHN R. TUNHEIM
United States District Judge