UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| U.H.A., K.A., M. DOE, H.D., D. DOE, *on behalf of themselves and others similarly situated*; and<br><br>THE ADVOCATES FOR HUMAN RIGHTS,<br><br>Petitioner-Plaintiff and Plaintiffs,<br><br>v.<br><br>PAMELA BONDI, *Attorney General of the United States*;<br><br>KRISTI NOEM, *Secretary of the United States Department of Homeland Security*;<br><br>TODD M. LYONS, *Acting Director of the United States Immigration and Customs Enforcement*;<br><br>DAVID EASTERWOOD, *Acting Director, St. Paul Field Office, U.S. Immigration and Customs Enforcement*;<br><br>JOSEPH B. EDLOW, *Director, U.S. Citizenship and Immigration Services*,<br><br>Defendants-Respondents. | Civil No. 26-417 (JRT/DLM)<br><br><br><br>**MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISSOLVE THE TEMPORARY RESTRAINING ORDER** |

Ariana Kiener, Bryan Plaster, E. Michelle Drake, Hans W. Lodge, John G. Albanese, Jordan C. Hughes, Joseph Hashmall, Katherine Raths, Marika K. O'Connor Grant, Soledad Slowing Romero, **BERGER MONTAGUE PC**, 1229

Tyler Street Northeast, Suite 205, Minneapolis, MN 55413; Megan McLaughlin Hauptman, Ghita Schwarz, Mevlude Amina Akay Alp, Pedro Sepulveda, Jr., **INTERNATIONAL REFUGEE ASSISTANCE PROJECT**, 650 Massachusetts Avenue, Suite 600, Washington, DC 20009; and Sarah Kahn, Bardis Vakili, **CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW**, 1505 East Seventeenth Street, Suite 117, Santa Ana, CA 92705, for Petitioner-Plaintiff and Plaintiffs.

Ana H. Voss, **UNITED STATES ATTORNEY'S OFFICE**, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415; Brantley Mayers, **DEPARTMENT OF JUSTICE**, 950 Pennsylvania Avenue Northwest, Washington, DC 20530, for Defendants-Respondents.

After the United States Department of Homeland Security (DHS) implemented a new policy that requires arresting and detaining individuals who are lawful refugees in Minnesota, Plaintiffs initiated this putative class action on behalf of Minnesota residents who are lawful refugees who have not yet been adjusted to lawful permanent resident status. On January 24, 2026, Plaintiffs moved for a temporary restraining order (TRO). (Docket No. 16.) On January 28, 2026, the Court granted Plaintiffs' motion for a TRO and (1) enjoined Defendants from arresting or detaining any member of the putative class in Minnesota on the basis that they are a refugee who has not yet adjusted to lawful permanent resident status; and (2) ordered the immediate return and release of the members of a putative subclass consisting of those refugees who are presently detained under the policy. (Docket No 41.) The next day, the Court found good cause to extend the effect of the TRO for an additional 14 days—to February 25, 2026—or until the Court issues an order on the preliminary injunction, whichever is earlier. (Docket No. 49.)

Defendants now move to dissolve the TRO, or alternatively, stay the TRO pending appeal. (Docket No. 55.) Because the *Dataphase* factors continue to weigh in favor of granting temporary relief, the Court will deny the motion.[1]

## BACKGROUND

On January 9, 2026, the Department of Homeland Security (DHS) and U.S. Citizenship and Immigration Services (USCIS) announced Operation Post-Admission Refugee Reverification and Integrity Strengthening ("Operation PARRIS").[2] (Class Action Compl. & Am. Pet. for Writ of Habeas Corpus ("Am. Pet.") ¶ 1, Jan. 24, 2026, Docket No. 12.) The Operation seeks to target and reexamine the legal status of Minnesota's roughly 5,600 refugees who have not yet secured lawful permanent resident (LPR) status. (Declaration of E. Michelle Drake ("Drake Decl.") ¶ 17, Jan. 24, 2026, Docket No. 16-4; Drake Decl., Ex. 15.) To effectuate this reexamination, DHS began the warrantless arrest and detention of refugees present in the United States for greater than one year who were still awaiting adjudication of their LPR status. (Am. Pet. ¶¶ 6–7; *see also* Defs.' Mem. Supp. Mot. Dissolve TRO at 4, Jan. 31, 2026, Docket No. 56.) Plaintiffs commenced this putative class action seeking to challenge the Refugee Detention Policy that Defendants

---

[1] Although the Court will order that Defendants' motion to dissolve the TRO be denied, the matter is not converted into a preliminary injunction. 11A Wright & Miller's Federal Practice & Procedure § 2953 (3d ed. 2025). The Court will consider whether to issue a preliminary injunction after briefing and the hearing scheduled on February 19, 2026.

[2] The Court extensively recounted the factual and procedural background of this litigation in *U.H.A. v. Bondi*, Civ. No. 26-417, 2026 WL 222226, at *1–3 (D. Minn. Jan. 28, 2026), which the Court does not repeat here.

have employed in furtherance of Operation PARRIS.³  (Am. Pet.; Pls.' Mot. for Rule 23(b)(2) Class Cert., Jan. 24, 2026, Docket No. 15.)  Plaintiffs then sought a TRO, seeking to enjoin enforcement of the Refugee Detention Policy.  (Mot. for TRO, Jan. 24, 2026, Docket No. 16.)

On January 28, 2026, the Court granted temporary relief to a putative "Class" defined as "[a]ll individuals with refugee status who are residing in the state of Minnesota, who have not yet adjusted to lawful permanent resident status, and have not been charged with any ground for removal under the Immigration and Nationality Act" and enjoined Defendants from arresting and detaining any member of the Class on the basis that they are a refugee who has not been adjusted to lawful permanent resident status. *U.H.A. v. Bondi*, Civ. No. 26-417, 2026 WL 222226, at *13 (D. Minn. Jan. 28, 2026).  The Court also granted temporary relief to a putative "Detained Subclass" defined as "[a]ll members of the Class who are or will be detained by DHS pursuant to the Refugee Detention Policy" and ordered their release.  (*Id.*)

On January 29, 2026, the Court issued an order concluding, that good cause existed to extend the TRO under Federal Rule of Civil Procedure 65(b)(2) to allow the parties the

---

³ Plaintiffs define the "Refugee Detention Policy" as Defendants' policy "that would subject all lawfully present refugees who have not yet obtained lawful permanent resident ("LPR") status to arrest and mandatory detention after being present in the United States for one year—even though refugees cannot adjust to LPR status until the one-year mark[.]" (Pls.' Mem. Supp. Mot. for TRO at 10, Jan. 24, 2026, Docket No. 16-2.)  This Policy would appear to subject **ALL** lawfully admitted refugees who are not yet adjusted to arrest and detention.  For ease and consistency, the Court will refer to DHS's new policy as the "Refugee Detention Policy."

requested amount of time to respond.[4] *U.H.A. v. Bondi*, Civ. No. 26-417, 2026 WL 242879, at *3 (D. Minn. Jan. 29, 2026). Accordingly, the TRO entered by the Court on January 28, 2026, will remain in effect until February 25, 2026, or until the Court rules on the preliminary injunction, whichever occurs first. *Id.*

Defendants move to dissolve the TRO or, alternatively, request that the TRO be stayed pending appeal. (Docket No. 55.)

## DISCUSSION

### I. STANDARD OF REVIEW

The purpose of a temporary restraining order or preliminary injunctive relief is to maintain the status quo. *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 664 (8th Cir. 2022). A party against whom a temporary restraining order has been entered may move to dissolve or modify the order on two days' notice to the opposing party.[5] Fed. R. Civ. P. 65(b)(4). The central inquiry in assessing whether to dissolve or modify a TRO is whether

---

[4] As previously noted by the Court, Defendants arguably consented to an extension under Rule 65(b)(2). At a status conference on January 26, 2026—two days before the Court entered the TRO—Defendants requested that they be given two weeks to respond to Plaintiff's motion for a temporary restraining order. (Hr'g Tr. at 14, Jan. 29, 2026, Docket No. 42 (The Court: "So if we are looking at a hearing on a preliminary injunction, regardless of what happens with the TRO, you want two weeks to respond to this in writing?" Defendants' counsel: "Yes, sir.").) Therefore, if the Court granted Defendants two weeks to respond and the Court did not extend the 14-day time limit, Plaintiffs would have little or no time to respond and the Court would have at most two days to issue an order before the TRO expired. Such a restricted time limitation would be unfair, in light of the important issues to consider in this case.

[5] Defendants state that they satisfied the two-day notice requirement by noticing their intent to dissolve the TRO by email on January 29, 2026. (Defs.' Mem. Supp. Mot. Dissolve TRO at 6 n.1, Jan. 31, 2026, Docket No. 56.)

the conditions that warranted the TRO continue to be present. *MiTek Inc. v. McIntosh*, Civ. No. 4:23-960, 2023 WL 5528034, at *1 (E.D. Mo. Aug. 28, 2023) (citing 11A Wright & Miller's Federal Practice & Procedure § 2953 (3d ed. 2023)). "[T]he Court should not dissolve a TRO if it believes the TRO is necessary to preserve the status quo and prevent irreparable harm." *Id.*

**II.   ANALYSIS**

Defendants argue that the TRO must be dissolved because Plaintiffs are not likely to succeed on the merits and balance of the harms and public interest weigh in their favor. The Court disagrees and will address each of Defendants' arguments and the *Dataphase* factors in turn.[6] *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981). The Court will also address—and deny—Defendants' requests to narrow the TRO and to stay pending appeal.

**A.   Likelihood of Success on the Merits**

Defendants argue that the TRO should be dissolved because they are likely to succeed on the merits, maintaining that the use of the term "custody" in 8 U.S.C. § 1159(a)(1) authorizes DHS to arrest and detain refugees who have been present in the United States for more than one year for "inspection and examination for admission" as

---

[6] In the Eighth Circuit, the Court considers four factors when considering a motion for a TRO: (1) the threat of irreparable harm to the moving party; (2) the state of balance between the alleged irreparable harm and the harm that granting the TRO would inflict on the other party; (3) the likelihood of the moving party's success on the merits; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981).

lawful permanent residents. Alternatively, Defendants argue that § 1159(a)(1) cross-references 8 U.S.C. § 1225, which mandates detention for certain noncitizens.[7] Defendants' arguments are unavailing.

### 1. Meaning of "Custody" Under 8 U.S.C. § 1159(a)(1)

Section 1159(a)(1) provides that once an individual has been admitted as a refugee under 8 U.S.C. § 1157 and has been physically present in the United States for over a year but has not been adjusted to LPR status, they must "at the end of such year period, return or be returned to the **custody** of the Department of Homeland Security for inspection and examination for admission to the United States as an immigrant in accordance with the provisions of sections 1225, 1229a, and 1231 of this title." 8 U.S.C. § 1159(a)(1) (emphasis added).

Defendants argue that the word "custody" in § 1159(a)(1)(c) mandates detention. The Court is not persuaded. As the Court explained previously, § 1159(a)(1)(C) provides that refugees "return or be returned to custody" for the **purpose** of inspection and reexamination of refugees. *See U.H.A.*, 2026 WL 222226, at *6. Within the context of § 1159(a)'s narrow purpose, the term "custody" does not mean detention for at least three reasons, in addition to those stated in the Court's order granting the TRO.[8] *See*

---

[7] For a more fulsome discussion of the statutory and regulatory background relevant to refugees, see *U.H.A.*, 2026 WL 222226, at *4–6.

[8] As discussed in the January 28, 2026 TRO Order, the Court listed four reasons that Defendants' interpretation of the word "custody" was unlikely to prevail:

*Nestle Purina Petcare Co. v. C.I.R.*, 594 F.3d 968, 971 (8th Cir. 2010) (noting that to analyze the plain text of a statute, the court must read "the statute as a whole by considering its context, object, and policy").

> **First**, the phrase "custody" in the statute is limited to a simple, narrow purpose: conducting "inspection and examination for admission to the United States as an immigrant[.]"  8 U.S.C. § 1159(a)(1)(C); *see Amin A. v. Trump*, Civ. No. 26-251, Docket No. 11, at 4 (D. Minn. Jan. 26, 2026).  In the context of that limited purpose, "custody" is best read to mean "responsibility" or "control," rather than prolonged detention. *See Custody*, Black's Law Dictionary (12th ed. 2024) (defining custody as, among other things, "responsibility for taking care of" and "[t]he care and control of a thing").  That is, § 1159 contemplates that a refugee be returned, temporarily, to the control of DHS because they have the responsibility to inspect and examine the refugee for admission.
>
> **Second**, ICE's own prior guidance interpreting these provisions has instructed officers that individuals who have not yet applied for adjustment to LPR status cannot be detained on that basis alone.  (2010 ICE Guidance at 2.)
>
> **Third**, the Supreme Court has interpreted 8 U.S.C. § 1182(d)(5)(A)—which contains nearly identical "be returned to custody" language—to not authorize detention. *See Clark v. Martinez*, 543 U.S. 371, 386 (2005) (interpreting the phrase "be returned to the custody" under § 1182(d)(5)(A) and concluding that "nothing in this text . . . affirmatively authorizes detention, much less indefinite detention").
>
> **Fourth**, interpreting the phrase "be returned to the custody" in § 1159(a) as mandating detention would lead to an illogical result.  Because § 1159(a) makes refugees ineligible for adjustment until one year after entry, Defendants' interpretation would subject **every** refugee to detention, **unless** USCIS conducted the inspection and examination precisely at the one-year mark.  That outcome is nonsensical and would cause many unadjusted refugees to celebrate their one-year anniversary in this country in a jail cell.

*U.H.A.*, 2026 WL 222226, at *8.

**First**, § 1159(a)(1)(C) states that refugees will be "**returned**" to DHS's custody. If "custody" implies detention, then the word "return" would imply that refugees were detained upon their arrival in the country. They were not. *See, e.g.*, *Jerson A.D.G. v. Bondi*, Civ. No. 26-516, 2026 WL 207352, at *2 (D. Minn. Jan. 27, 2026) ("'Return' implies something which has happened previously.") Instead, refugees are inspected and admitted into the country without being detained. *Matter of D-K-*, 25 I. & N. Dec. 761, 769 (B.I.A. 2012) (noting "that a refugee who ultimately becomes a lawful permanent resident will have been 'admitted' twice—**first, upon conditional admission** [under 8 U.S.C. § 1157] and second, upon reinspection and adjustment to permanent resident status under [8 U.S.C. § 1159.]" (emphasis added)). Because refugees were not detained when they arrived, it is impossible for them "return" to detention.

**Second**, the government's previous interpretations of § 1159(a)(1) support the conclusion that the term "custody" does not contemplate arrest and detention of unadjusted refugees. Contemporaneous interpretations of the statute "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024); *see also Kisor v. Wilkie*, 588 U.S. 558, 594 (2019) (Gorsuch, J., concurring in the judgment) (noting that "the government's early, longstanding, and consistent interpretation of a statute" may be "powerful evidence" of the statute's original meaning). Following the enactment of the Refugee Act of 1980, the statute's implementing regulations contemplated merely

9

that a "[n]otice [would] be sent to all refugees after one year to report for an interview." Aliens and Nationality; Refugee and Asylum Procedures, 46 Fed. Reg. 45116-01, 45117 (Sept. 10, 1981) (Final Rules); *see also* Aliens and Nationality; Refugee and Asylum Procedures, 45 Fed. Reg. 37,392, 37,392 (June 2, 1980) (Interim Regulations) ("Notice will be sent to all refugees and asylees after one year to report for an interview."). Nothing in these early implementing regulations contemplated the arrest or detention of unadjusted refugees—let alone arrest without a warrant or notice.

That understanding persisted for decades. As recently as 2010, Immigration and Custom Enforcement (ICE)'s own guidance expressly acknowledged that § 1159 is "not a proper basis for detaining" refugees who fail to apply for adjustment after one year. U.S. Immigr. & Customs Enf't, *Memorandum on Detention of Refugees Admitted Under INA § 207 Who Have Failed to Adjust to Lawful Permanent Resident Status* ("2010 ICE Guidance") at 2 (May 10, 2010).[9] Although that guidance was purportedly rescinded in December 2025,[10] the agency's consistent historical practice is strong evidence that the plain text of § 1159(a)(1) does not authorize DHS to arrest and detain unadjusted refugees, absent any ground of removability. Moreover, **current** federal regulations do

---

[9] (Drake Decl. ¶ 18 & Ex. 16.)

[10] (Decl. of Deputy Field Office Director Tauria Rich ("Rich Decl.") ¶ 6, Jan. 31, 2026, Docket No. 56-2.) The Court has seen no written document that rescinds the 2010 ICE Guidance. The Court therefore orders Defendants to submit any such documentation at the preliminary injunction stage.

not contemplate the arrest or detention of adjusted refugees, as the regulation governing the adjustment of status makes no reference to arrest or detention. *See* 8 C.F.R. § 209.1(b), (d) (describing the adjustment-of-status process as involving an application and an interview). Yet, Defendants go so far to say that § 1159(a) "**mandates** temporary detention." (Defs.' Mem. Supp. Mot. Dissolve TRO at 8 (emphasis added).) Accepting that assertion would require the Court to conclude that the executive branch has been violating § 1159(a)'s purported detention mandate since the Refugee Act of 1980 was passed because it has failed to arrest and detain adjusted refugees for the past 45 years. The Court declines to do so. Accordingly, the Court concludes that Defendants' "early, longstanding, and consistent interpretation of a statute" is "powerful evidence" that § 1159(a) does not permit arrest and detention of unadjusted refugees. *See Kisor*, 588 U.S. at 594 (Gorsuch, J., concurring in the judgment).

**Third**, if the Court were to adopt Defendants' interpretation of § 1159(a)(1), it would suggest that DHS had the right to detain adjusted refugees **indefinitely**, because the statute imposes no time limits on when the required inspection and examination must occur. It is axiomatic that courts must avoid construing statutes "in a manner that would render it clearly unconstitutional" when "there is another reasonable interpretation available." *Edmond v. United States*, 520 U.S. 651, 658 (1997). Indeed, courts—including this one—have acknowledged the constitutional concerns raised by Defendants'

expansive interpretation of § 1159(a)(1).[11]  Because a more reasonable interpretation is available—for the reasons set forth above and in the Court's January 28, 2026 Order—the Court declines to interpret § 1159(a) in a manner that renders it unconstitutional.[12]

In light of the text, history, and purpose of § 1159(a), the Court maintains that "'custody' is best read to mean 'responsibility' or 'control,' rather than prolonged detention."  *U.H.A.*, 2026 WL 222226, at *8 (quoting *Custody*, Black's Law Dictionary (12th ed. 2024)).[13]  Section 1159(a)(1) confers upon DHS the responsibility, to inspect and

---

[11] *See, e.g.*, *Jama A.O. v. Bondi*, Civ. No. 26-420, 2026 WL 185767, at *2 (D. Minn. Jan. 23, 2026) ("It is clear that Respondents' detention of Petitioner [under 8 U.S.C. § 1159(a)] violates the Due Process Clause because they do not have authority to detain him" because he held refugee status); *U.H.A.*, 2026 WL 222226, at *8 n.21.

[12]  The Court intends to hear oral argument on the Plaintiffs' constitutional claims at the hearing on the motion for preliminary injunction.

[13] To the extent § 1159(a) contemplates a refugee's involuntary encounter with federal officials, § 1159's plain text permits a return to custody (i.e., an interview with DHS) only for a single purpose—"inspection and examination for admission," and this statutorily-defined purpose places guardrails DHS's authority.  *See Aleksander B. v. Trump*, Civ. No. 26-170, 2026 WL 172435, at *5 (D. Minn. Jan. 22, 2026).  That is, DHS may not exercise control over a refugee solely under the authority of § 1159 after it has completed the "inspection and examination for admission" or if it is seeking to perform some function other than inspection and examination.  The temporary nature of § 1159(a)'s "custody" requirement is further confirmed by the requirement that any detention be grounded in §§ 1225, 1229(a), or 1231—provisions that, as the Court previously explained, do not apply here.  *U.H.A.*, 2026 WL 222226, at *13.  To be sure, the Court acknowledged in its previous January 28, 2026 order that "§ 1159 contemplates that a refugee be returned, temporarily, to the control of DHS because they have the responsibility to inspect and examine the refugee for admission."  *U.H.A.*, 2026 WL 222226, at *8.  And indeed, Defendants appear to concede that § 1159 does not permit prolonged or indefinite detention. (*See* Defs.' Mem. Supp. Mot. Dissolve TRO at 9–10, Jan. 31, 2026, Docket No. 56 ("Section 1159 also mandates **temporary** detention. . . . [and] authorizes DHS to arrest and detain a refugee for the **limited duration** of the statutorily mandated inspection and examination." (emphasis added)).)  At this stage of the proceeding, the Court concludes that § 1159 does not permit indefinite detention but, rather, a brief meeting for the purposes of "inspection and examination."  8 U.S.C. § 1159(a)(1)(c); *see also Jerson A.D.G. v. Bondi*, Civ. No. 26-516, 2026 WL

examine refugees in order to adjust their status to lawful permanent resident under § 1159(a)(2). It does not confer on DHS the authority to arrest and detain them. If DHS wishes to detain unadjusted refugees, they may do so if §§ 1225, 1229a, or 1231 apply. Because these three detention provisions do not apply to Plaintiffs and § 1159 does not provide independent detention authority, the Court finds that Defendants lack the authority to detain Plaintiffs.

### 2. 8 U.S.C. § 1159(a)'s Cross-Reference to § 1225

Defendants also contend that a cross-reference to § 1225(b) in § 1159(a) permits the detention of the putative class. The argument also fails.

Section 1225 applies to "applicants for admission"—noncitizens who are either "present in the United States who ha[ve] not been admitted" or "who arrive[ ] in the United States." 8 U.S.C. § 1225(a)(1). Applicants for admission fall under either § 1225(b)(1) or § 1225(b)(2). *Jennings v. Rodriguez*, 583 U.S. 281, 287 (2018). "Section 1225(b)(1) applies to aliens initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation" as well as "certain other aliens designated by the Attorney General in his discretion." *Id.* (citations omitted). Section 1225(b)(2) serves as a "catchall provision that applies to" almost all other applicants for admission not covered by § 1225(b)(1). *Id.*

---

207352, at *2 (D. Minn. Jan. 27, 2026). Of course, there is a much simpler, fully constitutional manner of achieving these purposes, the method in use for 45 years: sending a notice to appear.

The flaw in Defendants' argument that § 1225(b) permits detention of the putative class is simple: refugees are not "applicants for admission" under § 1225. *See, e.g.*, *Mohamednoor A. v. Bondi*, Civ. No. 26-525, 2026 WL 221926, at*3 (D. Minn. Jan. 28, 2026); *Jama A.O. v. Bondi*, Civ. No. 26-420, 2026 WL 185767, at *4 (D. Minn. Jan. 23, 2026). After thorough vetting and verification of refugee status, refugees are conditionally admitted when they enter the country, so they cannot be considered applicants for admission. *See Matter of D-K-*, 25 I. & N. Dec. at 769. This conclusion is also consistent with ICE's own guidance from July 2025, which states that § 1226 (discretionary detention), not § 1225, applies to "[noncitizens] admitted to the United States." *Jose J.O.E. v. Bondi*, 797 F. Supp. 3d 957, 963 (Aug. 27, 2025) (quoting Interim Guidance Regarding Detention Authority for Applicants for Admission to all ICE Employees, July 8, 2025).

In short, § 1159(a)'s cross-reference to § 1225 does not alter the Court's conclusion that § 1159(a)—neither alone nor in combination with § 1225(b)—does not authorize the detention of the putative Class or the Detained Subclass. Accordingly, Defendants are unlikely to succeed on the merits, and Defendants' arguments provide insufficient support for dissolving the TRO.

### B. Threat of Irreparable Harm

The Court previously concluded that Plaintiffs demonstrated a threat of irreparable harm, noting that Plaintiffs have suffered or face an imminent threat of being (1) arrested and detained without a warrant, (2) handcuffed and shackled for extended periods, (3)

hurriedly transported across the country, and (4) prevented from communicating with family, counsel, or their community. *U.H.A.*, 2026 WL 222226, at *8–9. In addition, under Defendants' interpretation of § 1159, there appears to be no limit on the length of detention that could be imposed on unadjusted refugees. Defendants do not appear to contest the Court's conclusion that Plaintiffs have demonstrated a threat of irreparable harm—for good reason. The second *Dataphase* factor therefore continues to strongly weigh in favor of Plaintiffs and cuts against the dissolution of the TRO.

    **C.**    **Balance of Harms and Public Interest**

The third and fourth *Dataphase* factors—balance of the harms and the public interest—merge when the Government is a party. *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1019 (8th Cir. 2023) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Defendants argue that the balance-of-harm and the public interest factors weigh in favor of Defendants because the TRO itself inflicts irreparable injury on Defendants. (Defs.' Mem. Supp. Mot. Dissolve TRO at 16.) It is true that "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Trump v. CASA,* 606 U.S. 831, 861 (2025) (quotation omitted). But it is also true that the Government has "no public interest in the perpetuation of unlawful agency action." *Missouri v. Trump*, 128 F.4th 979, 997 (8th Cir. 2025) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). Given the unlawfulness of DHS's Refugee Detention Policy, the public interest is not served by allowing Defendants to carry out such policy. Indeed, the

public interest in protecting refugee rights will be furthered by preserving the status quo. Therefore, both the balance-of-harm and the public interest factors continue to weigh in favor of granting temporary relief.

### D.     Scope of Relief

Defendants argue that the TRO is overbroad for three reasons.  **First**, Defendants contend that the TRO enjoins Defendants from "returning" refugees to DHS's custody under 8 U.S.C. § 1159(a), "for even a minute." (Defs.' Mem. Supp. Mot. Dissolve TRO at 17.)  The Court disagrees.  The TRO does not categorically bar the arrest of refugees; it bars arrest **solely** on the basis that a refugee has not yet had their status adjusted to LPR status.  The TRO likewise does not preclude Defendants from inspecting and examining unadjusted refugees by issuing a notice that requires them to appear for an interview. *See* 8 C.F.R. § 209.1(b), (d).

**Second**, Defendants argue that the Eighth Circuit's recent decision in *Tincher v. Noem*, No. 26-1105, 2026 WL 194768 (8th Cir. Jan. 26, 2026), forecloses temporary class-wide relief.  Quite the contrary.  In *Tincher*, the Eighth Circuit stayed a district court's preliminary injunction that barred federal officials from retaliating against protesters opposing the government's immigration-enforcement initiative, Operation Metro Surge. *Id.* at *1.  The Eighth Circuit concluded that a stay was warranted because the putative class had *"no* chance of getting certified" and because the injunction was impermissibly vague. *Id.*  The Court finds *Tincher* to be readily distinguishable.  Here, the putative class

16

and subclass are far more likely to be certified for the reasons set forth in the TRO Order. *See U.H.A.*, 2026 WL 222226, at *10–12 (analyzing the propriety of temporary class-wide relief under Rule 23). Indeed, *Tincher* itself acknowledged that "[c]ourts may issue temporary relief to a putative class." *Tincher*, 2026 WL 194768, at *1 (quoting *A.A.R.P. v. Trump*, 605 U.S. 91, 98 (2025)). Accordingly, the Court does not read *Tincher* to foreclose the putative class-wide relief granted here.

**Third,** Defendants assert that the Court's TRO violates 8 U.S.C § 1252(f)(1), which places limitations on the Court's authority to issue injunctive relief. 8 U.S.C § 1252(f)(1) provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter [8 U.S.C §§ 1221–1232] . . . ." Defendants concede—as they must—that § 1159(a) is not included in the relevant statutes cited in § 1252(f)(1). (Defs.' Mem. Supp. Mot. Dissolve TRO at 19.) Undeterred, Defendants argue that the TRO nevertheless violates § 1252(f)(1) because § 1159(a) cross-references § 1225, which is included in part IV. The Court rejects Defendants' claim. Defendants' proposition contradicts the plain meaning of the § 1252(f)(1). Moreover, as previously discussed, § 1225 does not apply to Plaintiffs.[14]

---

[14] Additionally, § 1252(f)(1) in no way prohibits courts from setting aside unlawful agency actions under APA, which forms the basis of some of Plaintiffs' claims. *See Garland v. Aleman Gonzalez*, 596 U.S. 543, 571 (2022) (Sotomayor, J., concurring in part) ("[T]he Court does not purport to hold that § 1252(f)(1) affects courts' ability to 'hold unlawful and set aside agency action, findings, and conclusions' under the Administrative Procedure Act." (citing 5 U.S.C § 706(2)).

Because Court is unpersuaded by Defendants' arguments that the TRO is overbroad, the scope of the TRO will remain unchanged.

### E. Stay Pending Appeal

Finally, Defendants' request that the TRO be stayed pending appeal if the Court denies their motion to dissolve the TRO. Courts consider four factors when assessing whether to stay a party's motion pending appeal: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken*, 556 U.S. at 434 (citation omitted). In light of the "substantial overlap" with the *Dataphase* factors and the Court's prior conclusions that the *Dataphase* factors weighed in favor of granting temporary relief, a stay is not warranted. *See id.* Defendants' request for a stay pending appeal will therefore be denied.

## CONCLUSION

Defendants have failed to show that conditions that warranted the TRO are no longer present. After careful consideration of the limited record before the Court, the Court finds that the *Dataphase* factors continue to weigh in favor of granting Plaintiffs temporary relief. Accordingly, the TRO is necessary to preserve the status quo and to protect Plaintiffs from irreparable harm.

It remains important to note that this case involves only the adjustment of status of **refugees who reside in Minnesota.** It does not apply beyond the state's borders.

Refugees are thoroughly vetted and examined **before** admission to the United States and once admitted, they are provided assistance to assimilate in communities across the country. The one-year check-in is just that—an inspection. There is no requirement that refugees be re-vetted. And it appears to the Court that unadjusted refugees have no incentive to avoid inspection, as completing the check-in is a prerequisite to obtaining lawful permanent resident status. Mandatory detention, in addition to being practically impossible given the number of refugees awaiting inspection and adjustment, seems clearly to be a solution in search of a problem. The swift reinterpretation of long held and consistently understood applications of the law raises serious constitutional questions that must be addressed by this Court.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendants' Motion to Dissolve the Temporary Restraining Order (Docket No. [55]) is **DENIED**.

2. Defendants' alternative request for a stay of the Temporary Restraining Order pending appeal (Docket No. [55]) is **DENIED**.

3. Plaintiffs' request for discovery is **GRANTED**, as follows: Defendants shall produce and file under seal within **3 days** all documents cited or relied on in Defendants' Motion to Dissolve the Temporary Restraining Order (Docket No. [55]), including

the ICE rescission memorandum regarding 8 U.S.C. § 1159, documents related to Defendants' re-vetting and screening process, and documents related to Operation PARRIS.

4. Defendants are ordered to provide a status update on the return and release of Members of the putative Detained Subclass by **5:00 p.m. on February 11, 2026**.

5. Defendants are ordered to comply with Local Rule 7.1(a) before filing a motion. The District of Minnesota requires parties to meet and confer, before filing a motion, in a good-faith effort to resolve the issues raised in the motion.

DATED: February 9, 2026  
at Minneapolis, Minnesota.

                /s/ John R. Tunheim  
                JOHN R. TUNHEIM  
                United States District Judge