# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

U.H.A., *on behalf of themselves and others similarly situated*,

Petitioner-Plaintiff,

and

K.A., M. DOE, H.D., D. DOE, *on behalf of themselves and others similarly situated*; and THE ADVOCATES FOR HUMAN RIGHTS,

Plaintiffs,

v.

PAMELA BONDI, *Attorney General of the United States*;

KRISTI NOEM, *Secretary, United States Department of Homeland Security*;

TODD M. LYONS, *Acting Director, United States Immigration and Customs Enforcement*;

DAVID EASTERWOOD, *Acting Director, St. Paul Field Office, U.S. Immigration and Customs Enforcement*;

JOSEPH B. EDLOW, *Director, U.S. Citizenship and Immigration Services*,

Defendants-Respondents.

Civil No. 26-417 (JRT/DLM)

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

---

Ariana Kiener, Bryan Plaster, E. Michelle Drake, Hans W. Lodge, John G. Albanese, Jordan C. Hughes, Joseph Hashmall, Katherine Raths, Marika K. O'Connor Grant, and Soledad Slowing Romero, **BERGER MONTAGUE PC**, 1229 Tyler Street Northeast, Suite 205, Minneapolis, MN 55413; Kimberly Robin Grano, Megan McLaughlin Hauptman, Ghita Schwarz, Mevlude Amina Akay Alp, and Pedro Sepulveda, Jr., **INTERNATIONAL REFUGEE ASSISTANCE PROJECT**, 650 Massachusetts Avenue, Suite 600, Washington, DC 20009; and Sarah Kahn and Bardis Vakili, **CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW**, 1505 East Seventeenth Street, Suite 117, Santa Ana, CA 92705, for Petitioner-Plaintiff and Plaintiffs.

Brantley Mayers, **U.S.DEPARTMENT OF JUSTICE**, 950 Pennsylvania Avenue Northwest, Washington, DC 20530, for Defendants-Respondents.

When the clock strikes 12:00 a.m. on the 366th day after a refugee was lawfully admitted to the United States, according to the Government, 8 U.S.C. § 1159(a) gives Department of Homeland Security officials the power to arrest and detain that refugee with no limits on the length of detention.  Because § 1159(a) provides no such power, the Court will issue a preliminary injunction enjoining Defendants from arresting or detaining refugees in Minnesota on the basis that have not yet been adjusted to lawful permanent resident status—which, by law, cannot occur until one year has passed.  The Court will not allow federal authorities to use a new and erroneous statutory interpretation to terrorize refugees who immigrated to this country under the promise that they would be welcomed and allowed to live in peace, far from the persecution they fled.

The Government contends that § 1159(a) provides them with arrest-and-detention power and that such power is necessary to prevent refugees from skipping

town before they have been adjusted to lawful permanent resident status. The Government's position flatly contradicts the plain meaning of § 1159(a) and contravenes forty-five years of agency practice. Section 1159(a) did not give the Government this authority when Congress passed this provision in 1980, and it does not give the Government the authority to do so now.

Decades ago, as a nation, we made a solemn promise to refugees fleeing persecution: that after rigorous vetting, they would be welcomed to the United States and given the opportunity to rebuild their lives. We assured them that they could care for their families, earn a living, contribute to their communities, and live in peace here in the United States. We promised them the hope that one day they could achieve the American Dream.

The Government's new policy breaks that promise—without congressional authorization—and raises serious constitutional concerns. The new policy turns the refugees' American Dream into a dystopian nightmare. Until the Court can resolve those issues on the merits, it will not allow federal authorities to cast aside the commitment made to those who were vetted, admitted, and came to this country in reliance on our word.

Because the *Dataphase* factors all weigh in favor of granting preliminary injunctive relief, the Court will issue a preliminary injunction enjoining Defendants from arresting or detaining any member of the putative class in Minnesota on the basis that they are a

refugee who has not yet adjusted to lawful permanent resident status and postpone the effective date of Defendants' detention policy pursuant to 5 U.S.C. § 705.  Because the putative detained subclass members have been released, the Court will deny for now preliminary injunctive relief as to that subclass.

## BACKGROUND

Before addressing whether a preliminary injunction is appropriate, the Court will outline the relevant factual background, provide an overview of the statutory and regulatory framework governing refugees, and summarize the relevant procedural history.

## I.    FACTUAL BACKGROUND

On January 9, 2026, the Department of Homeland Security (DHS) and the United States Citizenship and Immigration Services (USCIS) announced Operation Post-Admission Refugee Reverification and Integrity Strengthening ("Operation PARRIS"). (Class Action Compl. & Am. Pet. for Writ of Habeas Corpus ("Am. Pet.") ¶ 1, Jan. 24, 2026, Docket No. 12.)  According to USCIS's press release announcing the program, it is a "sweeping initiative" intended to "reexamin[e] thousands of refugee cases through new background checks and intensive verification of refugee claims."[1]  (Decl. of E. Michelle Drake ("Drake Decl.") ¶ 17, Ex. 15, Jan. 24, 2026, Docket No. 16-19.)  The press release

---

[1] U.S. Citizenship and Immigr. Servs., *DHS Launches Landmark USCIS Fraud Investigation in Minnesota* (Jan. 9, 2026), https://www.uscis.gov/newsroom/news-releases/dhs-launches-landmark-uscis-fraud-investigation-in-minnesota.  (Filed at Docket No. 16-19.)

emphasizes that the "initial focus [of Operation PARRIS] is on Minnesota's 5,600 refugees who have not yet been given lawful permanent resident status (Green Cards)." (*Id.*)

Petitioner-Plaintiff U.H.A. and Plaintiffs K.A., H.D., D. Doe, and M. Doe (collectively, the "Named Plaintiffs") are refugees who were lawfully admitted to the United States through the United States Refugee Admissions Program (USRAP) after completing a rigorous vetting process. (Am. Pet. ¶ 9.) The Named Plaintiffs are originally from Africa, Asia, or Latin America and reside in Minnesota. (*Id.* ¶ 11.) The Named Plaintiffs have not yet been adjusted to lawful permanent resident status (sometimes referred to as "green card" status). (*Id.* ¶¶ 3, 11.) None of the Named Plaintiffs have been charged with any ground for removal under the Immigration and Nationality Act ("INA"), nor have they been declared a danger to the public or a flight risk. (*Id.* ¶¶ 9, 11.)

The Named Plaintiffs' accounts illustrate the impact of Defendants' new program. Petitioner-Plaintiff U.H.A. is a refugee, admitted into the United States in 2024, who was arrested by ICE while driving to work on January 18, 2026. (*Id.* ¶ 15.) He was pulled over, ordered out of his car, handcuffed, and detained, without a warrant or apparent justification. (*Id.*) U.H.A., who lives with his parents and siblings, has no criminal history and has never been placed in removal proceedings. (*Id.*) Plaintiff K.A., U.H.A.'s younger brother, is also a refugee. (*Id.* ¶ 16.) K.A. was driving behind U.H.A. on their way to work on January 18 and witnessed his brother's arrest on the highway. (*Id.*) K.A. now fears that he, too, will be arrested by ICE. (*Id.*) He has not returned home since that day, "[n]or

has he ventured out to attend his college classes or to buy groceries."  (*Id.*)  K.A., like his brother, has no criminal history.  (*Id.* ¶ 111.)  At the time Plaintiffs filed their Amended Petition, U.H.A. was in detention.[2]  (*Id.* ¶ 110.)

Plaintiff H.D. is a refugee who applied to become a lawful resident in 2025, and she fears leaving her home as a result of Operation PARRIS.  (*Id.* ¶ 17.)  ICE officers "came to [H.D.'s] family home twice within a week and attempted to get her family to open the door; fearful, they did not."  (*Id.* ¶ 112.)  H.D. received a letter "instructing her to report to an appointment at an ICE office for a case review interview"—but H.D. has a friend, also a refugee, who "had applied for a green card," and was arrested by ICE at a case review appointment.  (*Id.* ¶ 112.)  Fearful for her own liberty, H.D. did not attend.  (*Id.*) "She secured a lawyer who attended on her behalf, but the ICE officer refused to communicate with her lawyer."  (*Id.*)  H.D.'s "experience has caused her to relive similar experiences of armed men knocking on her door in the country she fled."  (*Id.*)

D. Doe, a refugee, was at home with his family on January 11, 2026, when a man in plain clothes knocked on the door.  (*Id.* ¶ 18.)  D. Doe answered the door, and the man told him that he had hit D. Doe's car—but his description did not match D. Doe's car.  (*Id.*) The man left, and returned a few minutes later, this time describing the correct car.  (*Id.*) When D. Doe went outside to check the damage, he was surrounded by armed men and

---

[2] It is the Court's understanding that Petitioner-Plaintiff U.H.A. was released following the Court's January 28, 2026 TRO order.

arrested.  (*Id.*)  After being taken to a detention center in Minnesota, he was immediately flown to Texas, where he was interrogated about his refugee status.  (*Id.*)  He was kept in "shackles and handcuffs" for sixteen hours.  (*Id.* ¶ 113.)  D. Doe was ultimately released on the streets of Texas, left to find his way back to Minnesota.  (*Id.* ¶ 18.)  After seeing her spouse, D. Doe, arrested, Plaintiff M. Doe fears that she may be arrested and detained by ICE, and that both parents may be separated from their three-year-old son.  (*Id.* ¶¶ 19, 114.)

Plaintiff the Advocates for Human Rights is a 501(c)(3) legal services nonprofit organization.  (*Id.* ¶ 115.)  They allege that their "core business activities have been significantly impacted" by Defendants' new policy, and that they have "been unable to assist clients that it would have ordinarily served" due to the need to "divert significant resources to representing refugees in habeas proceedings."  (*Id.* ¶¶ 116–17.)

Plaintiffs also submitted declarations concerning Operation PARRIS's effect on other refugees in Minnesota.  For instance, one refugee—a junior in high school—was arrested and detained after she was pulled over on her way to school.  (Drake Decl. ¶ 9, Ex. 7.)  She told the ICE agents that she was a minor and provided them with her driver's license, which showed that she was a minor.  (*Id.* ¶¶ 7–8.)  ICE agents handcuffed her and forced her to leave the vehicle on the road.  (*Id.* ¶ 9.)  ICE agents told her that she was going to be sent to Texas or Chicago.  (*Id.* ¶¶ 10–11.)  ICE then learned that a judge had ordered them not to transport her outside of Minnesota, and an ICE agent had her call

her parents to come get her. (*Id.* ¶¶ 12–13.) The ICE agent told her to tell her family that if they came to get her, ICE would send them all to Texas. (*Id.*) Her family decided not to pick her up. (*Id.*) **At that point, ICE took her to a hotel where she spent the night in same room with two ICE agents.** (*Id.* ¶¶ 14–16.) Although she had her own bed, she did not have her own room. (*Id.* ¶ 17.) The next day, she was released and allowed to leave with her lawyer. (*Id.* ¶ 18.)

Another refugee, a father of a four-year-old girl, submitted green card applications for his family in 2025. (Drake Decl. ¶ 10, Ex. 8 ¶ 3.) While at work, he received a call from his wife that ICE agents had shown up to their house and told her that they had not completed their green card applications. (*Id.* ¶ 4.) That same day, ICE made three return visits to the home. (*Id.* ¶¶ 5–6.) On the first return visit, ICE agents took his wife and daughter's passports and told them that the documents could be picked up the next day. (*Id.* ¶ 5.) On the third return visit, an ICE agent took his wife and daughter into custody. (*Id.* ¶ 6.) After being taken into custody, an ICE officer called him, using his wife's cell phone, and told him that they had arrested his wife and daughter and would be sending them to Texas. (*Id.* ¶ 7.) ICE gave him the option to go with his family. (*Id.*) When he reached the ICE office near the airport, ICE agents directed him to his wife and daughter, closed the door, and told him to give them his phone and belongings. (*Id.* ¶ 9.) He was fingerprinted and handcuffed in front of his family. (*Id.*) ICE agents told him that they could not tell him why he was being detained. (*Id.* ¶ 10.) The refugee and his family were

flown to a detention facility in Houston, Texas and for nearly ten hours, they were held in a small room, which had bright lights, a dirty toilet, and a tiny metal bench next to the toilet. (*Id.* ¶¶ 12–13.) The family noted a camera that made them feel unsafe to use the toilet. (*Id.* ¶ 13.) The family was taken to a hotel at around 3:00 a.m.; three ICE officers stayed in the room with them overnight. (*Id.* ¶ 15.) In the morning, the refugee and his family were transported back to the detention facility where they were interviewed about their refugee applications for more than three hours. (*Id.* ¶¶ 16–20.) After the interviews, they were transported from Houston to San Antonio. (*Id.* ¶ 21.) ICE eventually released the refugee and his family on January 16, 2026, at an airport in Texas, where they were left to return to their home in Minnesota at their own expense. (*Id.* ¶ 22.)

## II.     STATUTORY AND REGULATORY FRAMEWORK

Decades ago, Congress amended the Immigration and Nationality Act (INA) by enacting the Refugee Act of 1980. Pub. L. No. 96-212, 94 Stat. 102 (1980). The Act was passed to create a clear, consistent, and humane system for admitting and resettling refugees in the United States. *Id.* The Act emphasized "that it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands," which includes providing resettlement opportunities as well as humanitarian and transitional assistance to those who qualify as a refugee. *Id.* § 101.

To qualify for resettlement in the United States, the noncitizen must meet the definition of a refugee. A refugee is an individual "who is unable or unwilling to return

9

to . . . [their country of origin] because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . ." 8 U.S.C. § 1101(a)(42).

To be admitted into the United States as a refugee, a prospective refugee must complete many steps. First, the prospective refugee must be referred to the United States Refugee Admissions Program (USRAP), an interagency initiative involving multiple governmental and nongovernmental entities, including the Department of State, the Department of Homeland Security, the United Nations High Commissioner for Refugees, the Department of Health and Human Services' Office of Refugee Resettlement, Resettlement Support Centers, and the International Organization for Migration.[3] To obtain such a referral, the prospective refugee must typically must register with the United Nations High Commissioner for Refugees (UNHCR) in the country where they have sought refuge.[4] UNCHR then determines whether resettlement in a third country is the

---

[3] U.S. Citizenship and Immigr. Servs., *The United States Refugee Admissions Program (USRAP) Consultation and Worldwide Processing Priorities,* https://www.uscis.gov/humanitarian/refugees-and-asylum/usrap [https://perma.cc/G3WN-NYD2] (last visited Feb. 23, 2026).

[4] U.S. Dep't of State, *Refugee Admissions*, https://2021-2025.state.gov/refugee-admissions/ [https://perma.cc/4SA8-PYD6] (last visited Feb. 23, 2026).

best option.[5]  But because so many people are displaced worldwide, typically only about one percent of registrants are referred for resettlement in a third country.[6]

After a refugee applicant is referred, they must undergo extensive security screening conducted by multiple federal agencies, including the National Counterterrorism Center, the FBI's Terrorist Screening Center, the Drug Enforcement Agency, the Department of Defense, and others.[7]  An applicant's biometric and biographic information is screened against numerous databases, including the Consular Lookout and Support System and other intelligence community systems.[8]

After completing the biometric and biographic checks, USCIS conducts an interview to determine whether the individual qualifies for refugee status.[9]  During this interview, USCIS verifies the applicant's biographic information, confirms that the applicant properly accessed the USRAP, and assesses whether the applicant meets the legal definition of a refugee.[10]  USCIS also evaluates whether the applicant is admissible to the United States,

---

[5] *Id.*

[6] *Id.*

[7] U.S. Citizenship and Immigr. Servs., *Refugee Processing and Security Screening*, https://www.uscis.gov/humanitarian/refugees-and-asylum/refugees/refugee-processing-and-security-screening [https://perma.cc/PZJ4-RDUT] (last visited Feb. 23, 2026).

[8] *Id.*

[9] *Id.*

[10] *Id.*

whether the applicant has participated in the persecution of others, and whether the applicant has already been firmly resettled in another country.[11]

Once an applicant is conditionally approved, applicants must complete a medical examination as well as a cultural orientation program.[12] Applicants are assigned to a local resettlement agency in the United States.[13] Before traveling to the United States, applicants are subject to additional security screening.[14] Upon arrival, applicants are inspected by U.S. Customs and Border Protection, and if eligible, admitted into the United States.[15]

Once admitted, refugees are automatically authorized to work. 8 C.F.R. § 274a.12(a)(3). They are also eligible for resettlement assistance, which provides refugees access to housing, food, clothing, orientation programs, English-language instruction, employment training, and medical and social services.[16] The stated purpose

---

[11] *Id.*

[12] U.S. Citizenship and Immigr. Servs., *United States Refugee Admissions Program (USRAP)*, https://www.uscis.gov/sites/default/files/document/charts/USRAP_FlowChart.pdf [https://perma.cc/P4MA-2ELM] (last visited Feb. 23, 2026).

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] U.S. Citizenship and Immigr. Servs., *United States Refugee Admissions Program (USRAP)*, https://www.uscis.gov/sites/default/files/document/charts/USRAP_FlowChart.pdf [https://perma.cc/P4MA-2ELM] (last visited Feb. 23, 2026); 8 U.S.C. § 1522.

of providing this assistance is to help refugees "become effectively resettled as quickly as possible." 8 U.S.C. § 1522(a).

An individual with conditional refugee status is considered to have been "admitted." *Matter of D-K-*, 25 I. & N. Dec. 761, 769 (B.I.A. 2012) (concluding that "an alien admitted to the United States as a refugee has been 'admitted' for the purposes of [8 U.S.C. § 1101(a)(13)(A)]"). However, under the relevant statutory framework, a refugee's conditional admission may ultimately result in two "admissions." *Id.* at 768. The first is the initial conditional admission; the second occurs when the refugee is adjusted to lawful permanent resident ("LPR") status. *Id.* (noting "that a refugee who ultimately becomes a lawful permanent resident will have been 'admitted' twice—first, upon conditional admission [under 8 U.S.C. § 1157] and second, upon reinspection and adjustment to permanent resident status under [8 U.S.C. § 1159.]").

After either of these admissions, Congress has imposed restraints on the Government's authority to commence removal proceedings. That is, a refugee may only be removed based on the grounds of **deportability** under 8 U.S.C. § 1227 but may not be removed under grounds of **inadmissibility** under 8 U.S.C. § 1182. *Matter of D-K-*, 25 I. & N. Dec. at 768 (acknowledging that, once conditionally admitted or adjusted to LPR status, the individual is "subject to charges under only the deportability grounds, and not the grounds of inadmissibility"). An individual designated as a refugee may also be subject to removal if the individual is later found not to meet the definition of a "refugee" under 8

13

U.S.C. § 1101(a)(42).  *See* 8 U.S.C. § 1157(c)(4).  If USCIS subsequently determines that the noncitizen was not a "refugee," regulations require USCIS to provide the noncitizen written notice of its intent to terminate the noncitizen's refugee status.  8 C.F.R. § 207.9. The noncitizen then has 30 days to respond.  *Id.*

Once an individual has been admitted as a refugee under § 1157 and has been physically present in the United States for over a year, but has not been adjusted to LPR status, they must "at the end of such year period, return or be returned to the custody of the Department of Homeland Security for inspection and examination for admission to the United States as an immigrant in accordance with the provisions of sections 1225, 1229a, and 1231 of this title."  8 U.S.C. § 1159(a)(1).

Three aspects of § 1159 warrant emphasis.  **First**, the statute requires refugees who have resided in the United States for more than one year to submit to DHS for inspection and examination.  However, § 1159 "permits custody for a specific and limited function: to allow DHS to conduct the inspection necessary to adjudicate adjustment of status under § 1159(a)(2)."  *E.E. v. Bondi*, Civ. No. 26-314, slip. op. at 7 (D. Minn. Jan. 17, 2026) (vacated on other grounds).  Federal regulations require refugees to apply for adjustment to LPR status one year after entry and to submit biometric information; such regulations further provide that USCIS will decide "on a case-by-case basis" whether an interview with an immigration officer is required to determine eligibility for LPR status.  8 C.F.R § 209.1(b), (d).

**Second**, detention of a refugee after "inspection and examination" is subject to 8 U.S.C. §§ 1225, 1229a, and 1231. 8 U.S.C. § 1159(a)(1).  Section 1225 provides for mandatory detention for certain inadmissible noncitizens "arriving in the United States," 8 U.S.C. § 1225(b)(1), and noncitizens deemed "applicant[s] for admission" that are "seeking admission," 8 U.S.C. § 1225(b)(2)(A).  Section 1229a governs removal proceedings.  Under § 1231, a noncitizen subject to a final order of removal must be detained during a 90-day removal period, which generally starts when the order becomes administratively final.  8 U.S.C. § 1231(a)(1)(A)–(B), (a)(2)(A).  After the 90-day removal period ends, the noncitizen may be detained if determined "to be a risk to the community or unlikely to comply with the order of removal."  8 U.S.C. § 1231(a)(6).

**Third**, refugees who meet the statutory requirements to obtain lawful permanent resident status are entitled to that status.  *See* 8 U.S.C. § 1159(a)(2) ("Any [noncitizen] who is found upon inspection and examination by an immigration officer . . . to be admissible . . . shall, notwithstanding any numerical limitation . . . be regarded as lawfully admitted to the United States for permanent residence[.]").

ICE's longstanding agency guidance has been that failure to obtain LPR status, by itself, is not grounds for removal nor is it a "proper basis for detaining them."  U.S. Immigr. & Customs Enf't*, Detention of Refugees Admitted Under INA § 207 Who Have Failed to Adjust to Lawful Permanent Resident Status* at 2 (May 10, 2010) ("2010 ICE Guidance")[17];

---

[17] (Drake Decl. ¶ 18, Ex. 16.)

*see also Liban G. v. Noem*, Civ. No. 26-301, 2026 WL 125689, at *2 (D. Minn. Jan. 16, 2026).

Indeed, this guidance provided that if "an unadjusted refugee [is arrested] upon reasonable belief of removability," the Government must decide within 48 hours of the arrest, whether to release the refugee or to commence removal proceedings by issuing a Notice to Appear.[18]  (2010 Ice Guidance at 2.)  But "[i]f it becomes apparent earlier that no removability ground applies, the individual must be released promptly."  (*Id.*)

ICE, however, recently rescinded its 2010 ICE Guidance on December 18, 2025. U.S. Immigr. & Customs Enf't, *Rescission ICE Policy No. 11039.1: Detention of Refugees Admitted Under INA § 207 Who Have Failed to Adjust to Lawful Permanent Resident Status* at 1 (Dec. 18, 2025) ("December Rescission Memo").[19]  The seven-line rescission memorandum stated the rescission was necessary "to protect its citizens from terrorist attacks and other national security and public safety threats."[20]

On February 18, 2026—the day before the preliminary injunction hearing in this case—ICE issued a seven-page memorandum stating that although "ICE believes the December rescission is valid, DHS has undertaken a fresh look at the past policies and

---

[18] *See also* 2010 ICE Guidance at 3 ("If a determination to place an unadjusted refugee in removal proceedings has not been made within the initial 48-hour period . . . the [Detention and Removal Operations] Field Office should release the alien with a reminder that the INA imposes an obligation upon him or her to apply for adjustment of status under section 209(a) and to provide DHS with updated address information[.]").

[19] (Defs.' Mem. Regarding Document Prod., Ex. A, Feb. 12, 2026, Docket No. 112-1.)

[20] *Id.*

rescinds them anew." U.S. Immigr. & Customs Enf't, *Detention of Refugees Who Have Failed to Adjust to Lawful Permanent Resident Status* at 1 (Feb. 18, 2026) ("February Re-Rescission Memo").[21] The memorandum established that if a refugee does not voluntarily submit themselves to DHS for inspection and examination under § 1159 one year after admission, "DHS will return the individual to custody (i.e., arrest and detain) for this purpose," and "DHS may maintain custody for the duration of the inspection and examination process." *Id.* at 2.

## III.    PROCEDURAL BACKGROUND

On January 18, 2026, Petitioner-Plaintiff U.H.A. filed a Verified Petition for Writ of Habeas Corpus following his arrest and detention under Operation PARRIS. (Docket No. 1.) On January 24, 2026, U.H.A, K.A., H.D., D. Doe., M. Doe., and The Advocates for Human Rights (collectively, "Plaintiffs") filed a Class Action Complaint and Amended Petition for Writ of Habeas Corpus, alleging that Defendants' policy of arresting and detaining unadjusted refugees through the implementation of Operation PARRIS violates the Administrative Procedure Act, the *Accardi* Doctrine, and the Fourth and Fifth Amendments of United States Constitution. (Am. Pet. ¶¶ 118–69.)

Plaintiffs filed several other motions at the same time as the Amended Petition, including a motion for a temporary restraining order and a motion for class certification.[22]

---

[21] (Defs.' Mem. Regarding Document Prod., Ex. A at 2, Feb. 18, 2026, Docket No. 122-1.)

[22] (1) Motion for Entry of Preliminary Protective Order (Jan. 24, 2026, Docket No. 13); (2) Motion for Leave to Proceed Under Pseudonyms and to Seal (Jan. 24, 2026, Docket No. 14); (3)

Plaintiffs moved for a temporary restraining order (TRO), asking the Court to (1) postpone the effective date of the "Refugee Detention Policy" Defendants have employed in furtherance of Operation PARRIS;[23] (2) enjoin Defendants from arresting or detaining any member of the putative Class on the basis that they are an unadjusted refugee; and (3) order that a subgroup of putative class plaintiffs who were detained under the Refugee Detention Policy be immediately released from custody.  (Pls.' Mem. Supp. Mot. for TRO at 50, Jan. 24, 2026, Docket No. 16-2.)

Plaintiffs also filed a motion for class certification under Federal Rule of Civil Procedure Rule 23(b)(2).  Plaintiffs requested certification of a "Class" of "[a]ll individuals with refugee status who are residing in the state of Minnesota, who have not yet adjusted to lawful permanent resident status and have not been charged with any ground for removal under the [Immigration and Nationality Act]."  (Pls.' Mot. for Rule 23(b)(2) Class Cert. at 2, Jan. 24, 2026, Docket No. 15.)  Plaintiffs also requested certification of a "Detained Subclass," consisting of "[a]ll members of the Class who are or will be detained by DHS pursuant to the Refugee Detention Policy."  (*Id.*)

_____

Motion for Rule 23(b)(2) Class Certification (Jan. 24, 2026, Docket No. 15); and (4) Motion for Temporary Restraining Order and Immediate Postponement of Agency Action (Jan. 24, 2026, Docket No. 16).

[23] Plaintiffs define the "Refugee Detention Policy" as Defendants' policy "that would subject *all* lawfully present refugees who have not yet obtained lawful permanent resident ("LPR") status to arrest and mandatory detention after being present in the United States for one year—even though refugees cannot adjust to LPR status until the one-year mark[.]"  (Pls.' Mem. Supp. Mot. for TRO at 10, Jan. 24, 2026, Docket No. 16-2.)  For ease and consistency, the Court will refer to DHS's new policy, as defined by Plaintiffs, as the "Refugee Detention Policy."

On January 28, 2026, the Court granted temporary relief to a putative "Class" defined as "[a]ll individuals with refugee status who are residing in the state of Minnesota, who have not yet adjusted to lawful permanent resident status, and have not been charged with any ground for removal under the Immigration and Nationality Act" and enjoined Defendants from arresting and detaining any member of the Class on the basis that they are a refugee who has not been adjusted to LPR status.  *U.H.A. v. Bondi*, Civ. No. 26-417, 2026 WL 222226, at *13 (D. Minn. Jan. 28, 2026).  The Court also granted temporary relief to a putative "Detained Subclass" defined as "[a]ll members of the Class who are or will be detained by DHS pursuant to the Refugee Detention Policy" and ordered their release.  (*Id.*)

On January 29, 2026, the Court issued an order concluding that good cause existed to extend the TRO under Federal Rule of Civil Procedure 65(b)(2) to allow the parties the requested amount of time to respond.[24]  *U.H.A. v. Bondi*, Civ. No. 26-417, 2026 WL 242879, at *3 (D. Minn. Jan. 29, 2026).  The Court ordered that the TRO entered on

---

[24] As previously noted by the Court, Defendants arguably consented to an extension under Rule 65(b)(2).  At a status conference on January 26, 2026—two days before the Court entered the TRO—Defendants requested that they be given two weeks to respond to Plaintiffs' motion for a preliminary injunction.  (Hr'g Tr. at 14, Jan. 29, 2026, Docket No. 42 (The Court: "So if we are looking at a hearing on a preliminary injunction, regardless of what happens with the TRO, you want two weeks to respond to this in writing?"  Defendants' counsel: "Yes, sir.").)  Therefore, if the Court had granted Defendants two weeks to respond and the Court had not extended the 14-day time limit, Plaintiffs would have had little or no time to respond and the Court would have had at most two days to issue a further order before the TRO expired.  Such a restricted time limitation would be unfair, considering the important issues to consider in this case.

January 28, 2026, would remain in effect until February 25, 2026, or until the Court ruled on the preliminary injunction, whichever occurred first.  *Id.*

On January 31, 2026, Defendants moved to dissolve the TRO, and requested, in the alternative, that the TRO be stayed pending appeal.  (Docket No. 55.)  On February 3, the Court denied Defendants' motion to dissolve the TRO, concluding that Defendants had failed to show that the conditions that warranted the TRO were no longer present and that the *Dataphase* factors continued to weigh in favor of granting temporary relief.  *U.H.A. v. Bondi*, Civ. No. 26-417, 2026 WL 357636, at *8 (D. Minn. Feb. 9, 2026).  The Court also denied Defendants' alternative request to stay the TRO pending appeal.  *Id.*

The Court heard oral argument on whether to issue a preliminary injunction on February 19, 2026.

**DISCUSSION**

**I.    STANDARD OF REVIEW**

The purpose of a temporary restraining order or a preliminary injunction is to maintain the status quo.  *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 664 (8th Cir. 2022). Courts evaluating a motion for a TRO or preliminary injunctive relief weigh four factors, commonly referred to in the Eighth Circuit as the *Dataphase* factors: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm injunctive relief would cause to the other litigants; and (4) the public interest.  *Dataphase Sys., Inc. v. C L*

*Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc).  The movant has the burden of proving all the *Dataphase* factors.  *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

When applying these factors, "a court should flexibly weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires the court to intervene."  *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 601 (8th Cir. 1999) (quoting *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998)).  That said, injunctive relief is an extraordinary remedy, and the movant has the burden of establishing the propriety of an injunction.  *Watkins Inc.*, 346 F.3d at 845.  The Court will address each of the *Dataphase* factors in turn.

## II.   LIKELIHOOD OF SUCCESS ON THE MERITS

To be entitled to a preliminary injunction, Plaintiffs must show that they are likely to succeed on the merits of any one of their claims.  *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016).  However, the question is not whether the movant has "prove[d] a greater than fifty per cent likelihood that [they] will prevail," *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007), but whether any of their claims provide a "fair ground for litigation," *Watkins*, 346 F.3d at 844.  "In considering the likelihood of the movant prevailing on the merits, a court does not decide whether the movant will ultimately win." *PCTV Gold*, 508 F.3d at 1143.  Rather, the movant must show that they have a "fair chance of prevailing" on their claims, "with a 'fair chance' meaning something less than fifty percent."  *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008).   While no single factor is

determinative, likelihood of success on the merits is often considered the most significant of the *Dataphase* factors. *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013).

Plaintiffs argue that Defendants' Refugee Detention Policy (1) violates 8 U.S.C. § 1159(a); (2) violates their procedural due process rights; (3) infringes their substantive due process rights; (4) violates the Fourth Amendment; and (5) is arbitrary and capricious and must be set aside under the APA.[25] To obtain preliminary relief, Plaintiffs must demonstrate that they are likely to succeed on at least one of these claims. Although the Court will address each argument in turn, it finds that the Plaintiffs have shown that they have a fair chance of prevailing on each of their claims.

## A.    Statutory Authority

Section 1159(a)(1) provides that once an individual has been admitted as a refugee under 8 U.S.C. § 1157 and has been physically present in the United States for over a year but has not been adjusted to LPR status, they must "at the end of such year period, **return or be returned to the custody** of the Department of Homeland Security for inspection and examination for admission to the United States as an immigrant in accordance with

---

[25] Plaintiffs request that the Court stay the Refugee Detention Policy under 5 U.S.C. § 705 of the APA. (*See, e.g.*, Pls.' Reply Mem. Supp. Mot. Prelim. Inj. at 32.) The Court has the authority to "issue all necessary and appropriate process to postpone the effective date of" the agency action "or to preserve status or rights." 5 U.S.C. § 705. To determine whether a stay under § 705 is appropriate, the Court must apply the same factors used to decide whether to issue a preliminary injunction. *See Baggett Transp. Co. v. Hughes Transp., Inc.*, 393 F.2d 710, 716–717 (8th Cir. 1968); *Labnet Inc. v. U.S. Dep't of Lab.*, 197 F. Supp. 3d 1159, 1167 n.3 (D. Minn. 2016). The Court will therefore apply the *Dataphase* factors to determine whether a stay under § 705 should be issued.

the provisions of sections 1225, 1229a, and 1231 of this title."  8 U.S.C. § 1159(a)(1) (emphasis added).

### 1.    Meaning of "Custody" Under 8 U.S.C. § 1159(a)(1)

Defendants now argue that the phrase "be returned to the custody" in § 1159(a)(1) authorizes (and even mandates) DHS to arrest and detain refugees who have been present in the United States for more than one year for "inspection and examination" as lawful permanent residents.  Alternatively, Defendants argue that § 1159(a)'s cross-reference to § 1225 provides an independent basis for detention.

As the Court explained previously, § 1159(a)(1) provides that refugees shall "return or be returned to custody" for the **purpose** of "inspection and examination."  *See U.H.A.*, 2026 WL 222226, at *8.  Within the context of § 1159(a)'s specific purpose, the Court concludes for numerous reasons that the phrase "return or be returned to custody" does not permit the arrest and detention of unadjusted refugees that have not been charged with any ground of removability.

**First**, Defendants' interpretation of § 1159(a)(1) impermissibly renders the word "return" superfluous.  *See Corley v. United States*, 556 U.S. 303, 314 (2009) ("[A] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant[.]").  Section 1159(a)(1) provides that refugees shall "return **or** be returned to the custody" of DHS for inspection and examination.  8 U.S.C. § 1159(a)(1) (emphasis added).  If Defendants are authorized to arrest and detain refugees 366 days after they are admitted, it would be impossible for

such refugees to submit themselves to DHS **voluntarily** because they cannot apply for LPR status until they have been present in the United States for one year.  *See* 8 U.S.C. § 1159(a)(1)(B); 8 C.F.R. § 209.1(a)(1) (noting that to be eligible for LPR status, the refugee "is required to apply to USCIS one year after entry in order for USCIS to" make an LPR adjustment determination); *id.* § 209.1(b) (providing that "every refugee entrant will be notified of the requirement to submit an application for permanent residence one year after entry").  Although the phrase "be returned" connotes a form of government coercion, the word "return" does not—especially when placed next to and contrasted with the phrase "be returned."  If Defendants' interpretation is correct, the word "return" would be meaningless.

**Second,** § 1159(a)(1) states that refugees shall "**return** or be **returned**" to DHS's custody.  If "custody" is read to mean arrest and detention, then "returned" would suggest that refugees were arrested and detained when they first entered the country.  But they were not: they were inspected and admitted into the country without being detained.  *See Jerson A.D.G. v. Bondi*, Civ. No. 26-516, 2026 WL 207352, at *2 (D. Minn. Jan. 27, 2026) ("Refugees are not detained upon arrival, therefore, they could not be 'returned' to detention."); *Matter of D-K-*, 25 I. & N. Dec. at 769 (noting "that a refugee who ultimately becomes a lawful permanent resident will have been 'admitted' twice— **first, upon conditional admission** . . . and second, upon reinspection and adjustment to

permanent resident status" (emphasis added)).  Because refugees were not detained upon arrival, they cannot "be returned" to detention.

**Third**, the Government's previous interpretations of § 1159(a)(1) reinforce the conclusion that the term "custody" does not translate to arrest and detention of unadjusted refugees.  Contemporaneous constructions of a statute "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance."  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024); *see also Kisor v. Wilkie*, 588 U.S. 558, 594 (2019) (Gorsuch, J., concurring in the judgment) (noting that "the government's early, longstanding, and consistent interpretation of a statute" may be "powerful evidence" of the statute's original meaning).  In the wake of the Refugee Act of 1980, the implementing regulations contemplated only that a "[n]otice [would] be sent to all refugees after one year to report for an interview."  Aliens and Nationality; Refugee and Asylum Procedures, 46 Fed. Reg. 45116-01, 45117 (Sept. 10, 1981) (Final Rules); *see also* Aliens and Nationality; Refugee and Asylum Procedures, 45 Fed. Reg. 37392, 37392 (June 2, 1980) (Interim Regulations) ("Notice will be sent to all refugees and asylees after one year to report for an interview.").  These early regulations made no mention of arrest or detention of refugees who had not yet acquired permanent resident status—much less arrest or detention without a warrant or prior notice.

That understanding endured for decades.  And as recently as 2010, ICE's own guidance expressly recognized that § 1159 is "not a proper basis for detaining" refugees

who fail to apply for adjustment after one year.  2010 ICE Guidance at 2.  Although Defendants declared they rescinded the 2010 ICE Guidance on December 18, 2025, and then "re-rescinded" it on February 18, 2026, the agency's consistent historical practice is strong evidence that the plain text of § 1159(a)(1) does not authorize or require DHS to arrest and detain unadjusted refugees, absent any ground of removability.  Moreover, **current** federal regulations do not contemplate the arrest or detention of unadjusted refugees, as the regulation governing the adjustment of status does not refer to arrest or detention.  *See* 8 C.F.R. § 209.1(b), (d) (describing the adjustment-of-status process as involving an application and an interview).  Yet, Defendants have argued that § 1159(a) "**mandates** temporary detention."  (Defs.' Mem. Supp. Mot. Dissolve TRO at 8, Jan. 31, 2026, Docket No. 56 (emphasis added).)  If the Court were to accept that argument, it would have to conclude that the executive branch has been violating § 1159(a)'s supposed detention mandate for the past forty-five years, because it has never arrested or detained unadjusted refugees in the years since the Refugee Act of 1980 was enacted. The Court declines to make such a finding and concludes that Defendants' "early, longstanding, and consistent interpretation of a statute" is, indeed, "powerful evidence" that § 1159(a) does not permit arrest and detention of unadjusted refugees.  *See Kisor*, 588 U.S. at 594 (Gorsuch, J., concurring in the judgment).

**Fourth**, the Supreme Court has concluded that 8 U.S.C. § 1182(d)(5)(A)—which contains nearly identical "be returned to custody" language—does not authorize

detention. *See Clark v. Martinez*, 543 U.S. 371, 385 (2005) (interpreting the phrase "be returned to the custody" under § 1182(d)(5)(A) and concluding that "nothing in this text . . . affirmatively authorizes detention, much less indefinite detention"). "[W]hen Congress uses the same language in two statutes having similar purposes . . . it is appropriate to presume that Congress intended that text to have the same meaning in both statutes." *Smith v. City of Jackson*, *Miss.*, 544 U.S. 228, 233 (2005).

**Fifth**, Defendants' broad interpretation of § 1159(a) would likely render the statute unconstitutional. Courts must avoid construing statutes in ways that would make them unconstitutional when a reasonable alternative interpretation is available. *Edmond v. United States*, 520 U.S. 651, 658 (1997). If the Court were to accept Defendants' interpretation of § 1159(a)(1)—that DHS may (or even must) arrest and detain refugees after the one-year mark—the statute would effectively permit DHS to detain refugees indefinitely. Neither § 1159(a)(1) nor the relevant regulations set any deadline for when the required inspection and examination must occur. A statute that permits indefinite detention would present serious constitutional concerns. *See Zadvydas v. Davis*, 533 U.S. 678, 699–701 (2001) (holding that although 8 U.S.C. § 1231(a)(6)—which applied to noncitizens subject to a final removal order—imposed no express time limit on the length of detention, a limitation on length of detention should be read into § 1231(a)(6) to avoid constitutional concerns).

**Sixth**, reading § 1159(a)'s "be returned to custody" language to require or authorize arrest and detention leads to an absurd outcome. Since § 1159(a) bars adjustment before the one-year mark, Defendants' interpretation would subject **all** refugees to detention unless USCIS conducted the inspection and examination precisely at the one-year mark. That outcome makes little sense and undermines the claim that § 1159(a) mandates or authorizes detention.[26]

**Seventh**, in light of § 1159(a)'s limited purpose—ensuring that refugees undergo inspection and examination—the term "custody" is better understood to mean "responsibility" or "control," not arrest and detention. *Custody*, *Black's Law Dictionary* (12th ed. 2024) (defining custody as, among other things, "responsibility for taking care of" and "[t]he care and control of a thing"); *see also Kucana v. Holder*, 558 U.S. 233, 245 (2010) (noting that when a word that has "many dictionary definitions . . . [a court] must draw its meaning from its context"). In context, § 1159 simply envisions that a refugee

---

[26] Tacitly recognizing the absurdity of subjecting all unadjusted refugees to arrest and detention at the one-year mark, Defendants shifted course in their opposition memorandum. According to Defendants' January press release announcing Operation PARRIS, the initiative targeted all of Minnesota's roughly 5,600 unadjusted refugees. (Drake Decl. ¶ 17, Ex. 15.) Yet in their opposition brief, Defendants advance a different position, asserting that "[u]nder § 1159, an alien may voluntarily 'return' for inspection and examination . . . [b]ut if an alien fails to voluntarily return, § 1159 requires" arrest and detention. (Defs.' Opp. Mot. Prelim. Inj. at 7, Feb. 11, 2026, Docket No. 107.) At least one difficulty with this revised position is that the record reflects implementation of the sweeping policy described in the January press release, not the narrower approach now presented in Defendants' opposition. Additionally, counsel for Defendants indicated that even if a refugee voluntarily returned, they could still be arrested and detained. (*See* Tr. of Jan. 19, 2026 Hr'g at 51, Jan. 22, 2026, Docket No. 129.)

be returned temporarily to DHS's control (i.e., being summoned to appear for an interview) so that the agency can carry out its inspection and examination responsibilities—functions that do not require, and have never required, arrest and detention.

Having the concluded that § 1159(a) does not provide an independent basis for detention, the Court must decide whether unadjusted refugees may be detained under §§ 1225, 1229a, or 1231. *See* 8 U.S.C. § 1159(a)(1). As the Court previously concluded in its order granting Plaintiffs' motion for a temporary restraining order, none of these provisions justify detention of refugees who have not yet secured LPR status and have not been charged with any ground of removability. *See U.H.A.*, 2026 WL 222226, at *7. Section 1225 is inapplicable to individuals admitted as refugees. *See Matter of D-K-*, 25 I. & N. Dec. at 769. Thus, they cannot be considered "arriving aliens" under § 1225(b)(1) or "applicant[s] for admission" under § 1225(b)(2) because they were admitted into the country when they were granted permission to resettle in the United States. Section 1229a only applies to noncitizens who have been placed in removal proceedings. Similarly, Section 1231 only applies to noncitizens that are subject to removal orders.[27]

---

[27] In addition to the detention grounds referenced in 8 U.S.C. § 1159(a) (i.e., §§ 1225, 1229a, 1231), 8 U.S.C. § 1226(c) imposes mandatory detention on a defined group of noncitizens who fall within "enumerated categories involving criminal offenses and terrorist activities." *Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018). Defendants have offered no evidence that any of the Named Plaintiffs have committed any of the enumerated crimes. Mandatory detention under § 1226(c) therefore does not apply to the Named Plaintiffs. And by definition, members of the putative Class and Detained Subclass have not been charged with any ground of

Accordingly, after considering the text, history, and purpose of § 1159(a), the Court concludes that § 1159(a) does not give DHS the power to arrest or detain refugees who have not yet obtained LPR status.  Rather, § 1159(a)(1) grants DHS the responsibility to inspect and examine refugees for the purpose of adjusting their status to LPR status under § 1159(a)(2).[28]  If DHS wishes to detain unadjusted refugees, it may only do so under §§ 1225, 1229a, or 1231.  Because Defendants have not demonstrated that any of these provisions apply to Plaintiffs, and § 1159(a) provides no independent detention authority, Defendants lack statutory authority to detain refugees solely on the basis that they have not yet secured LPR status and they have not be charged with any grounds of removability.

### 2.    8 U.S.C. § 1159(a)'s Cross Reference to § 1225

As previously explained, § 1159(a)(1) provides that any "inspection and examination for admission to the United States as an immigrant" must be done "in accordance with the provisions of sections 1225, 1229a, and 1231 of this title."  8 U.S.C.

---

removability; therefore, § 1226(c) does not apply to the putative Class or the putative Detained Subclass.

[28] To the extent § 1159(a) envisions a refugee's involuntary encounter with federal authorities, its plain language limits any return to custody (i.e., a DHS interview) to a single, specific purpose: "inspection and examination for admission."  This statutory purpose places clear boundaries on DHS's authority.  *See Aleksander B. v. Trump*, Civ. No. 26-170, 2026 WL 172435, at *5 (D. Minn. Jan. 22, 2026).  DHS may not exercise control over a refugee under § 1159 once the "inspection and examination for admission" is complete, or for any purpose unrelated to that inspection.  The temporary and limited nature of § 1159(a)'s custody requirement is reinforced by the fact that any detention must justified under §§ 1225, 1229a, or 1231— provisions that, as the Court has already explained, are inapplicable here.

§ 1159(a)(1).  Defendants argue, in the alternative to their arguments addressed above, that § 1159(a)'s cross-reference to § 1225 permits detention of unadjusted refugees.  The Court also rejects this argument.

Section 1225 applies to "applicants for admission"—noncitizens who are either "present in the United States who ha[ve] not been admitted" or "who arrive[] in the United States."  8 U.S.C. § 1225(a)(1).  Applicants for admission fall under either § 1225(b)(1) or § 1225(b)(2).  *Jennings v. Rodriguez*, 583 U.S. 281, 287 (2018).  "Section 1225(b)(1) applies to aliens initially determined to be inadmissible due to fraud, misrepresentation, or lack of valid documentation" as well as "certain other aliens designated by the Attorney General in his discretion."  *Id.* (citations omitted).  Section 1225(b)(2) serves as a "catchall provision that applies to" almost all other applicants for admission not covered by § 1225(b)(1).  *Id.*

Defendants' claim that § 1225(b) allows detention of the putative class is flawed because refugees are not "applicants for admission" under § 1225(a)(1).  *See, e.g.,* *Mohamednoor A. v. Bondi*, Civ. No. 26-525, 2026 WL 221926, at*3 (D. Minn. Jan. 28, 2026); *Jama A.O. v. Bondi*, Civ. No. 26-420, 2026 WL 185767, at *4 (D. Minn. Jan. 23, 2026).  After undergoing robust screening, refugees are conditionally admitted upon arrival, so they cannot be considered applicants for admission.  *See Matter of D-K-*, 25 I. & N. Dec. at 769.  ICE's own July 2025 guidance confirms this interpretation, specifying that § 1226 (discretionary detention)—not § 1225 (mandatory detention)—applies to

31

"[noncitizens] admitted to the United States." *Jose J.O.E. v. Bondi*, 797 F. Supp. 3d 957, 963 (D. Minn. Aug. 27, 2025) (quoting Interim Guidance Regarding Detention Authority for Applicants for Admission to all ICE Employees, July 8, 2025).

Consequently, § 1159(a)'s cross-reference to § 1225 does not change the analysis. DHS does not possess authority under § 1159(a), either independently or in conjunction with § 1225, to detain members of the putative Class or the Detained Subclass.

*    *    *

Accordingly, Plaintiffs have shown that they are likely to succeed in showing that § 1159(a) authorizes arrest and detention of refugees who have not yet adjusted to LPR status and have not been charged with any grounds of removability.

### B.    Procedural Due Process

Plaintiffs argue that Defendants' Refugee Detention Policy violates their procedural due process rights under the Fifth Amendment of the United States Constitution because Defendants' Refugee Detention Policy does not provide any notice or opportunity to be heard prior to arrest.  Defendants counter that the Policy presents no procedural due process concerns because Plaintiffs do not explain how more process (e.g., an evidentiary hearing) "would produce a fact 'material to' § 1159(a)."  (Defs.' Opp. Mot. Prelim. Inj. at 22, Feb. 11, 2026, Docket No. 107.)

The Fifth Amendment bars the government from depriving a noncitizen of his liberty without due process of law.  *Sanchez-Velasco v. Holder*, 593 F.3d 733, 737 (8th Cir. 2010).  "Due process is a flexible concept, requiring only 'such procedural protections as

the particular situation demands.'" *Clark v. Kan. City. Mo. Sch. Dist.*, 375 F.3d 698, 702 (8th Cir. 2004) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)).  To determine whether a procedural due process violation occurred, the Court must consider three factors: (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation through the procedures used, as well as the value of additional safeguards, if any; and (3) the Government's interest, including the burdens that additional safeguards would entail.  *Mathews*, 424 U.S. at 335.  The Court will address each factor in turn.

### 1. Private Interest

A person's interest in freedom from physical detention is "the most elemental of liberty interests."  *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004); *see also Zadvydas*, 533 U.S. at 690 ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Fifth Amendment's Due Process] Clause protects.").  When considering the private interest, courts consider the detainee's conditions of confinement, namely, "whether a detainee is held in conditions indistinguishable from criminal incarceration."  *Günaydin v. Trump*, 784 F. Supp. 3d 1175, 1187 (D. Minn. May 21, 2025).

This factor favors Plaintiffs.  Plaintiffs have a strong interest in remaining free from detention, and the record shows that refugees have been held in facilities in Texas and Minnesota that are indistinguishable from, or closely resemble, traditional incarceration.  In fact, the facilities may be worse than traditional incarceration.  (*See, e.g.*, Drake Decl. ¶ 10, Ex. 8 ¶ 13); *Advocs. for Hum. Rts. v. U.S. Dep't of Homeland Sec.*, Civ. No. 26-749,

33

2026 WL 404457, at *2–8 (D. Minn. Feb. 12, 2026); *Pedro Eduardo R.P. v. Bondi*, Civ. No. 26-1323, 2026 WL 473140 (D. Minn. Feb. 17, 2026).  As a result, Plaintiffs have either already experienced or face a substantial risk of "experiencing all the deprivations of incarceration, including loss of contact with friends and family, loss of income earning, interruptions to [their] education, lack of privacy, and, most fundamentally, the lack of freedom of movement."  *See id.*  The first *Mathews* factor therefore favors Plaintiffs.

## 2. Risk of Erroneous Deprivation

The second step in determining what process is due is analyzing the risk of erroneous deprivation.  *See Mathews,* 424 U.S. at 334–35.  The risk of erroneous deprivation appears to be high for three reasons.

First, for the reasons stated above, Defendants lack statutory authority to arrest and detain Plaintiffs, and therefore, the risk of erroneous deprivation is high.  *See Jerson A.D.G.*, 2026 WL 207352, at *1 (concluding that a refugee's due process rights were violated when respondents detained him under 8 U.S.C. § 1159(a)(1) because they did not have the authority to detain him).

Second, Defendants' reading of § 1159(a)(1) would effectively permit indefinite detention, even though Defendants now describe the statute as authorizing merely "temporary" detention.  (Defs.' Opp. Mot. Prelim. Inj. at 8.)  Defendants' interpretation creates a serious risk that refugees could be subject to DHS control for reasons beyond the statute's limited authorization.  Section 1159(a)(1) permits "custody" for one defined purpose: "inspection and examination for admission."  The record shows that adjustment

34

interviews occur during regular business hours and typically last between three and four hours, and ICE does not need to seize personal property or use handcuffs or shackles to complete these interviews.  (Suppl. Decl. of Allegra Drobnick ¶ 9, Feb. 15, 2026, Docket No. 119; Decl. of Samantha M. Rollins Murphy ¶¶ 4–5, Feb. 2, 2026, Docket No. 120; Decl. of Mary Ghandour ¶¶ 7–10, Feb. 15, 2026, Docket No. 121.)  Thus, if DHS exercises control over a refugee for a period longer than three to four hours, the risk that the refugee is being held for a purpose other than inspection and examination increases significantly.

To be sure, the limited record before the Court demonstrates the probability and magnitude of the risk of erroneous deprivation.  For instance, Petitioner-Plaintiff U.H.A. was pulled over on his way to work, ordered out of his car, handcuffed, and detained on January 18, 2026, without a warrant or apparent justification.  (Am. Compl. ¶ 15.)  U.H.A. was released after being detained for weeks, and only after the Court ordered that he be released since he was part of the Detained Subclass.[29]  *See U.H.A.*, 2026 WL 242879, at *3.  Plaintiff D. Doe was arrested on January 11, 2026, without a warrant, transported to a detention center in Minnesota, then flown in shackles to Texas, where he was questioned about his refugee status.  (Am. Compl. ¶ 18.)  He was kept in "shackles and handcuffs" for **sixteen** hours.  (*Id.* ¶ 113.)  He was ultimately released several days later,

---

[29] U.H.A. was still detained at 6:11 p.m. on January 30, 2026 (*see* Docket No. 53) but was released before February 4, 2026 (*see* Docket No. 80).

on January 17, on the streets in Houston, Texas, outside the detention center without his identifying documents.  (*Id.* ¶ 18.)

Third, as demonstrated by the Named Plaintiffs' accounts, Defendants' Refugee Detention Policy has been carried out without prior notice or an opportunity to be heard in a pre-deprivation hearing.  Absence of these elements means that that a detained refugee will not have any particularized or individualized consideration of their case before being deprived of their liberty interest.  *See Günaydin*, 784 F. Supp.3d at 1188 (finding that imposition of the automatic stay in bond cases deprived detainees of procedural due process since it does not consider "any individualized or particularized facts").

Under the second *Mathews* factor, the Court must also "consider the degree to which additional or substitute procedural safeguards could ameliorate the risks of erroneous deprivation."  *Maldonado v. Olson*, 795 F. Supp. 3d 1134, 1153 (D. Minn. 2025) (citing *Mathews*, 424 U.S. at 335).  Here, an obvious alternative to arrest and detention exists: Defendants could simply notify refugees of their adjustment interview and afford them the chance to attend voluntarily—summoning them only after the interview is scheduled.  Indeed, this approach is consistent with forty-five years of agency practice and federal regulations that establish the process for adjusting refugees' status to LPR.  *See* 8 C.F.R. § 209.  There is no indication in the record that this practice has been ineffective in achieving the statute's purpose.

In sum, Defendants' sweeping interpretation of § 1159(a)(1) creates a substantial risk of erroneously depriving Plaintiffs of their private interests, even though a simpler and less burdensome alternative would allow Defendants to achieve their stated policy objectives while adequately protecting Plaintiffs' rights. The Court therefore concludes that the second *Mathews* factor weighs in Plaintiffs' favor.

### 3.    Government's Interest

Under the third *Mathews* factor, the Court must consider the Government's interest, including the "fiscal and administrative burdens" that an "additional or substitute procedural requirement would entail." 424 U.S. at 335.

This factor also tips in favor of Plaintiffs. The Government has no interest in carrying out "unlawful agency action," and as established above, Defendants lack statutory authority to arrest and detain unadjusted refugees who are not subject to any grounds for removal. *See Missouri v. Trump*, 128 F.4th 979, 997 (8th Cir. 2025) (quoting *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)). However, even assuming that § 1159(a)(1) permits arrest and detention after the one-year mark and that Defendants fear that a refugee might skip their adjustment interview, a far simpler and less burdensome alternative exists: notify refugees of their interview, let them appear voluntarily, and call them in only after the interview is scheduled. The Court sees little justification for rounding up vetted, non-removable refugees only to interrogate, detain, and fly them across the country. In addition to interfering with refugees' liberty interests, such a policy results in a clear waste of time and resources.

Accordingly, the Court finds that all three *Mathews* factors weigh in favor of Plaintiffs' claim that Defendants' Refugee Detention Policy violates their due process rights under the Fifth Amendment. Plaintiffs therefore have demonstrated that they are likely to succeed on the merits of their Fifth Amendment procedural due process claim.

## C.   Substantive Due Process

Plaintiffs also allege that Defendants' Refugee Detention Policy violates their substantive due process rights under the Fifth Amendment of the United States Constitution. To prevail on a substantive due process claim, the plaintiff must demonstrate that the action (1) infringes on "'fundamental' liberty interests, without narrowly tailoring that interference to serve a compelling state interest"; or (2) is so outrageous that it shocks the conscience or otherwise offends our judicial notions of fairness. *Weiler v. Purkett*, 137 F.3d 1047, 1051 (8th Cir. 1998) (citing *Reno v. Flores*, 507 U.S. 292, 301–02 (1993)).

Plaintiffs argue that Defendants' interpretation of § 1159(a) infringes Plaintiffs' liberty interests in being free from detention and that Defendants' attempt to arrest and detain unadjusted refugees under § 1159(a) is not narrowly tailored to serve a compelling state interest. In response, Defendants argue that their interpretation of § 1159(a) does not violate Plaintiffs' substantive due process rights because Policy "bear[s] some reasonable relation to the purpose for which the individual is [detained]," and the detentions under Operation PARRIS are limited to the time reasonably necessary for DHS

to fulfill its statutory obligations.  (Defs.' Opp. Mot. Prelim. Inj. at 22 (alteration in original) (quoting *Jackson v. Indiana*, 406 U.S. 715, 738 (1972).)

The Court begins by identifying the parties' respective interests.  Plaintiffs—unadjusted refugees with no grounds of removability—undoubtedly possess a significant liberty interest in remaining free from detention.  *See Zadvydas*, 533 U.S. at 690.  The Government, for its part, has a strong interest in enforcing the Nation's immigration laws. *See Dep't of State v. Muñoz*, 602 U.S. 899, 911–12 (2024) ("[T]he through line of history is recognition of the Government's sovereign authority to set the terms governing the admission and exclusion of noncitizens.").  The Government also has a strong interest in promoting national security.  *See Haig v. Agee*, 453 U.S. 280, 307 (1981).

After careful consideration, the Court concludes that Plaintiffs are likely to succeed on the merits of their substantive due process claim for at least two independent reasons.

**First**, as previously explained, Defendants lack statutory authority under 8 U.S.C. § 1159 to arrest and detain Plaintiffs.  Absent such authority, the Refugee Detention Policy likely violates substantive due process.  *See Mohammed H. v. Trump*, 786 F. Supp. 3d 1149, 1158 (D. Minn. 2025) ("At its foundation, due process prohibits detaining an individual without justification.").

**Second**, Defendants' Refugee Detention Policy is not narrowly tailored.  Although Defendants claim that "detentions under Operation PARRIS are limited to the amount of time reasonably necessary for DHS to comply with its statutory obligations" (Defs.' Opp.

39

Mot. Prelim. Inj. at 22), neither their sweeping interpretation of § 1159(a) nor the record before the Court supports that claim. Defendants' reading of § 1159(a)(1) would give DHS the authority to detain unadjusted refugees indefinitely—a result the Supreme Court rejected in the context of noncitizens who have already been ordered removed. *See Zadvydas*, 533 U.S. at 689 (holding that § 1231(a)(6) does not authorize the government to detain an alien indefinitely and "limit[ing] an alien's post-removal-period detention to a period reasonably necessary to bring about that alien's removal from the United States"). Defendants' proposed boundless construction underscores the absence of narrow tailoring. Moreover, the record at this stage reflects that refugees subject to Defendants' Refugee Detention Policy **have been**—or face a substantial likelihood of being—arrested, handcuffed and shackled, detained, and transported out-of-state away from family and counsel. The Court therefore concludes that Defendants' sweeping and severe deprivations of liberty are not narrowly tailored to the interests they assert.

Accordingly, the Court concludes that Plaintiffs have shown that they are likely to succeed on the merits of their substantive due process claim.

### D.    Fourth Amendment

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. The Fourth Amendment's "basic purpose . . . is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Mun. Ct. of City & Cnty. of San Francisco*, 387 U.S. 523, 528 (1967). After

experiencing firsthand a government that policed its subjects without due respect for their individual liberties, "[t]he Founding generation crafted the Fourth Amendment as a response to the reviled general warrants and writs of assistance of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity." *Carpenter v. United States*, 585 U.S. 296, 303 (2018) (internal quotation marks omitted) (quoting *Riley v. California*, 573 U.S. 373, 403 (2014). The protections of the Fourth Amendment apply to arrests of noncitizens. *See United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010); *cf. United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975) ("For the same reasons that the Fourth Amendment forbids stopping vehicles at random to inquire if they are carrying aliens who are illegally in the country, it also forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens.").

Plaintiffs argue that Defendants' arrest and detention of refugees in reliance on § 1159—specifically, without a warrant or probable cause tied to a specific offense— violates the Fourth Amendment's prohibition on unreasonable seizures. Plaintiffs are likely to prevail on their Fourth Amendment claim for two key reasons.

**First**, for many of the same reasons outlined above, the Court concludes that the plain text of § 1159 creates no offense which unadjusted refugees have committed such that their arrest could be reasonable under the Fourth Amendment. Plaintiffs persuasively argue that the vague language of § 1159 stands in contrast with other

statutes through which Congress has granted immigration officials the power to make warrantless arrests. For example, 8 U.S.C. § 1357 expressly states that noncitizens can be arrested without a warrant if the immigration official has "reason to believe" that the noncitizen is "in the United States in violation of any such law or regulation [regulating the admission, exclusion, expulsion, or removal of aliens]," if they are also "likely to escape before a warrant can be obtained for his arrest." *See also Quintana*, 623 F.3d at 1239 ("The Attorney General's regulations implementing 8 U.S.C. § 1357(a) carefully distinguish between warrantless arrests for the purpose of commencing civil deportation proceedings, and warrantless arrests for criminal violations of the immigration laws[.]"). Section 1159, on the other hand, does not establish or reference any misconduct or offense which unadjusted refugees have committed that could give rise to any reasonable exercise of the Executive's arrest power. Importantly, refugees—who have been vetted and admitted to the country—commit no crime or removable offense in failing to obtain a green card one day after they become eligible to do so; nor do they lose their status as lawfully admitted to the United States.

"No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Terry v. Ohio*, 392 U.S. 1, 9 (1968) (quoting *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891)). Because § 1159 itself does not create any independent offense, criminal

or civil, justifying Plaintiffs' arrest, and does not reference any other statute that does so, the arrest of a refugee under § 1159 based solely on the fact that they have not yet been adjusted to LPR status is inconsistent with not only the statute itself, but with the refugee's Fourth Amendment right to be free from unreasonable seizures.

**Second**, even if the Court were to construe § 1159 to permit arrest and detention of some kind, the record before the Court provides no evidence that Defendants' warrantless arrests of refugees in furtherance of Operation PARRIS have been based upon individualized probable cause inquiries. The "Fourth Amendment's ultimate touchstone is 'reasonableness,'" *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006), and generally, this requires an arrest to be supported by either a warrant or probable cause. *See Terry*, 392 U.S. at 20 ("[W]henever practicable," the government must "obtain advance judicial approval of searches and seizures through the warrant procedure."); *Borgman v. Kedley*, 646 F.3d 518, 522–23 (8th Cir. 2011) ("A warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause . . . ."). Indeed, where Congress has established federal authority to make warrantless immigration-related arrests, the Eighth Circuit has read the requirements of the Fourth Amendment into the statute and required that such arrests be supported by probable cause. *Quintana*, 623 F.3d at 1239 ("Because the Fourth Amendment applies to arrests of illegal aliens, the term 'reason to believe' in § 1357(a)(2) means constitutionally required probable cause."). However, under Operation PARRIS, refugees in Minnesota have been arrested and flown across the

43

country: (1) without the warrants presumptively required under the Fourth Amendment, and (2) seemingly without probable cause that the refugees have committed any offense, even under § 1159.  Instead, Plaintiffs have presented evidence that arrests under Operation PARRIS may simply have been based on the fact that those detained were not citizens.[30]

Because the warrantless arrest of a refugee premised solely on their failure to adjust to LPR status violates that refugee's right to be free from unreasonable seizures and because Defendants have failed to demonstrate that arrests carried out in furtherance of Operation PARRIS have been supported by probable cause, the Court concludes that the Fourth Amendment provides an additional basis to support Plaintiffs' request for a preliminary injunction of the Refugee Detention Policy.

E.    APA

Plaintiffs argue that Defendants' Refugee Detention Policy violates the Administrative Procedures Act (APA).  Plaintiffs contend that Defendants' Policy is arbitrary and capricious and that, because it violates their constitutional rights, it must be set aside.  Defendants argue that Plaintiffs are not likely to succeed on their APA claim because DHS's enforcement decision is an agency action that is "committed to agency

---

[30] (*See, e.g.*, Drake Decl. ¶ 3, Ex. 1 (Decl. of U.H.A.) ¶¶ 9–12 ("The officer knocked on the window and told me to roll down the window.  He demanded to see my ID.  He asked me if I was a US Citizen.  I said no and he pulled me out of my car and put me in handcuffs behind my back. . . . He then repeated the same sentence telling me 'don't worry sir, you're going to go home soon. . . . you're going back to your country Ethiopia.'").)

discretion" by law, and therefore not reviewable under 5 U.S.C. § 701(a)(2). (Defs.' Opp. Mot. Prelim. Inj. at 19.) Defendants further argue that its recission of the 2010 ICE Guidance is reasonable and was reasonably explained in the December Recission Memo, which expressed that the policy change was "motivated by national security and public safety concerns." (*Id.* at 20.)

The APA provides that an agency acts unlawfully if the action is (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," (2) "contrary to constitutional right, power, privilege, or immunity," or (3) "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)–(C). An agency action is arbitrary and capricious when:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

The Court concludes that Plaintiffs have shown a likelihood of success on their APA claim for at least two reasons. **First**, neither the December Rescission Memo nor the February Re-Rescission Memo addresses—or even reflects—the Policy that has actually been implemented in Minnesota. Plaintiffs challenge Defendants' "Refugee Detention Policy," a policy "that would subject *all* lawfully present refugees who have not yet obtained lawful permanent resident ('LPR') status to arrest and mandatory detention

45

after being present in the United States for one year—even though refugees cannot adjust to LPR status until the one-year mark." (Pls.' Mem. Supp. Mot. for TRO at 10.) The record shows that this is the policy Defendants actually enacted and carried out.

Although Defendants acknowledge that the December Rescission Memo merely "rescind[s] the flat ban on detention for purposes of enforcing 8 U.S.C. § 1159" (Defs.' Opp. Mot. Prelim. Inj. at 21), neither memorandum explains why all refugees who have not adjusted status are (or even should be) subject to detention. (*See* Drake Decl. ¶ 17, Ex. 15 (providing ICE's January 9, 2026 press release, which emphasizes that the "initial focus [of Operation PARRIS] is on Minnesota's 5,600 refugees who have not yet been given lawful permanent resident status (Green Cards)").)

**Second**, as previously explained, the Refugee Detention Policy exceeds Defendants' authority under 8 U.S.C. § 1159 and infringes on Plaintiffs' constitutional rights under the Fourth and Fifth Amendments.

Defendants' argument that Plaintiffs' APA claim is unreviewable under 5 U.S.C. § 701(a)(2) is unavailing. "The APA establishes a basic presumption of judicial review" for agency action. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (internal quotation marks omitted). This presumption can be rebutted by a showing that the relevant statute precludes review or that the "agency action is committed to agency discretion by law[.]" *Id.* at 17 (quoting 5 U.S.C. § 701(a)). Nothing in § 1159 precludes judicial review. And the exception in § 701(a)(2), that the "agency action is committed to

agency discretion by law," is to be construed "quite narrowly" and applied only in "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Weyerhaeuser Co v. U.S. Fish & Wildlife Serv.*, 586 U.S. 9, 22 (2018) (citation and internal quotation marks omitted).  The Court concludes that this is **not** a situation where it has "no meaningful standard against which to judge the agency's exercise of discretion."  *See Id.*

Although the "limited category of unreviewable actions" can include "an agency's decision not to institute enforcement proceedings," *Regents*, 591 U.S. at 17 (citing *Heckler v. Chaney*, 470 U.S. 821, 831–32 (1985)), Defendants' Refugee Detention Policy can be distinguished from such a decision because 8 U.S.C. § 1159 does not grant DHS the amount or kind of discretion required for the agency's action to be unreviewable.

Section 1159 permits refugees who have not yet had their status adjusted to that of a lawful permanent resident to present themselves voluntarily for inspection before any arrest or detention occurs.  The statute also limits the purpose of custody: DHS may exercise custody over a refugee only to conduct inspection and examination in connection with adjustment of status.

In *Chaney,* the Supreme Court held "that an agency's decision not to take enforcement action should be presumed immune from judicial review under § 701(a)(2)."

470 U.S. at 832.[31]  But this exception set forth in *Chaney* does not apply because the 2010 ICE Guidance was not a non-enforcement policy.  It merely prohibited ICE from detaining refugees solely because they failed to apply for adjustment of status.  *See* 2010 ICE Guidance at 3.  Even under its prior policy, ICE continued its enforcement efforts by performing its inspection and examination duties under § 1159.

Moreover, DHS's subsequent decision to rescind the 2010 ICE Guidance and to interpret 8 U.S.C. § 1159 as authorizing the arrest and detention of refugees who have not adjusted to LPR status represents an affirmative act to enforce § 1159 differently than before.  That is a decision to act, not to refrain from action.  Further, even if the 2010 ICE Guidance were characterized as a non-enforcement policy, *Regents* declined to extend

_____

[31] In *Chaney*, the Court outlined several reasons why agency non-enforcement decisions are generally not suitable for judicial review:

> First, an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise.  Thus, the agency must not only assess whether a violation has occurred, but whether agency resources are best spent on this violation or another, whether the agency is likely to succeed if it acts, whether the particular enforcement action requested best fits the agency's overall policies, and, indeed, whether the agency has enough resources to undertake the action at all.  An agency generally cannot act against each technical violation of the statute it is charged with enforcing.  The agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities.

*Id.* at 831–32.  The Court then went on to explain that the agency's decision to not bring enforcement proceedings is similar to "the decision of a prosecutor in the Executive Branch not to indict."  *Id.* at 832.  To the extent 8 U.S.C. § 1159 gives DHS the power to arrest and detain unadjusted refugees, the concerns outlined in *Chaney* that would make the enforcement decisions unsuitable for judicial review are largely absent in this case.

the *Chaney* exception to decisions rescinding such policies. *See Regents*, 591 U.S. at 18 (declining to "test [the Government's] chain of reasoning" when they argued that the rescission of a non-enforcement policy was unreviewable under *Chaney*).

For these reasons, the Court concludes, on the record currently before the Court, that Plaintiffs have demonstrated that they are likely to succeed on the merits of their APA claim.[32]

\*    \*    \*

Accordingly, Plaintiffs have demonstrated that they are likely to succeed on the merits of at least one of their claims. Indeed, Plaintiffs have demonstrated they are likely to succeed on all of their claims. Plaintiffs have shown that Defendants lack lawful authority to detain them under § 1159(a). They have also shown that Defendants' Refugee Detention Policy violates procedural due process, substantive due process, the Fourth Amendment, and the APA. Therefore, the Court finds that the first *Dataphase* factor weighs in favor of Plaintiffs.

---

[32] On February 18, 2026—the day before the preliminary injunction hearing—ICE issued a seven-page memorandum that appeared to re-rescind the 2010 ICE Guidance, which had already been rescinded by a one-sentence memorandum in December 2025. The February Re-Recission Memo appears to be an impermissible post hoc rationalization, which cannot cure an APA violation. *See Mohammed H.*, 786 F. Supp. 3d at 1159 ("Post-hoc rationalizations will not suffice; agency action must be upheld, if at all, on the basis articulated by the agency itself.").

Bearing in mind that likelihood of success on the merits is often considered the most significant of the *Dataphase* factors, *Home Instead,* 721 F.3d at 497, the Court will turn to the consideration of the other *Dataphase* factors.

### III.   THREAT OF IRREPARABLE HARM

The Court will next consider the threat of irreparable harm.  "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).  "To succeed in demonstrating a threat of irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief." *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (internal quotation marks and citation omitted).

The Court previously concluded that Plaintiffs demonstrated a threat of irreparable harm, noting that Plaintiffs have suffered or face an imminent threat of being (1) arrested and detained without a warrant, (2) handcuffed and shackled for extended periods, (3) hurriedly transported across the country, and (4) separated from and prevented from communicating with family, counsel, or their community.  *U.H.A.*, 2026 WL 222226, at *8–9.

The Court likewise concludes that the threat of irreparable harm favors relief in the form of a preliminary injunction.  The loss of liberty is "perhaps the best example of irreparable harm." *See Matacua v. Frank*, 308 F. Supp. 3d 1019, 1025 (D. Minn. 2018).

The Court does not have to look far to see the grave and immediate threat of irreparable harm facing Plaintiffs.  To name a few, Petitioner-Plaintiff U.H.A., a refugee, was seized by armed, masked ICE officers without warning or explanation.  (Am. Compl. ¶ 110.)  He was handcuffed, placed in leg shackles, and given no basis for his arrest.  (*Id.*)  Agents transported him to a detention facility in Texas, where he was forced to sleep on the floor and share a single toilet with more than forty detainees.  (*Id.*)

Plaintiff D. Doe was similarly targeted.  ICE officers lured him outside by falsely claiming to have hit D. Doe's car.  (*Id.* ¶ 113.)  When he and his wife attempted to present proof of status, agents ignored the documentation, took him into custody, shackled him, and flew him to Texas.  (*Id.*)  He remained in shackles for sixteen hours.  (*Id.*)  He was ultimately released outside a detention center and left to make his own way back to Minnesota.  (*Id.*)

DHS's actions did not stop there.  Agents also arrested a high school junior while she was on her way to school and took her into custody.  (Drake Decl. ¶ 9, Ex. 7, Docket No. 16-11.)  She was compelled to spend the night in a hotel room with two ICE agents— without even being provided with a room of her own.  (*Id.*)

As for unadjusted refugees who have not yet been arrested under Defendants' Refugee Detention Policy, they too face a threat of irreparable harm.  Operation PARRIS was expressly designed to target "Minnesota's 5,600 refugees who have not yet been given lawful permanent resident status (Green Cards)."  (Drake Decl. ¶ 17, Ex. 15 (ICE's

January 9, 2026 press release).)  Refugees who have already been detained and released, as well as those who fall within the putative Class but have not yet been arrested, face a concrete and ongoing risk of arrest or re-arrest absent preliminary relief.  This fear is neither exaggerated nor speculative; it is a logical and entirely legitimate response to what has occurred.  Because Plaintiffs have shown a threat of irreparable harm, the Court concludes that the second *Dataphase* factor weighs heavily in favor of granting preliminary relief.

## IV.    BALANCE OF HARMS AND PUBLIC INTEREST

The third and fourth *Dataphase* factors—balance of the harms and the public interest—"merge when the Government is the party opposing the preliminary injunction." *Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1019 (8th Cir. 2023) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  For these factors, "the key question is whether the movant's likely harm without a preliminary injunction exceeds the nonmovant's likely harm with a preliminary injunction in place." *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1347 (8th Cir. 2024).

These factors also weigh in favor of Plaintiffs.  Defendants argue—as they did in their motion to dissolve the TRO—that the balance-of-the-harm and the public interest factors favors weigh in favor of Defendants because a preliminary injunction itself would inflict irreparable injury on Defendants.  The Court rejected that argument then, *see U.H.A.*, 2026 WL 357636, at *6, and rejects it again here.

It is true that "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025) (citation and quotation marks omitted).  But it is also true that the Government has "no public interest in the perpetuation of unlawful agency action." *Missouri*, 128 F.4th at 997 (quoting *Newby*, 838 F.3d at 12); *Schmitt v. Rebertus*, 148 F.4th 958, 970 (8th Cir. 2025) ("[I]t is always in the public interest to protect constitutional rights." (citation omitted)).

Given the unlawfulness of DHS's Refugee Detention Policy, the public interest is not served by allowing Defendants to carry out such policy.  To the extent the Government has an interest in carrying out Operation PARRIS, these interests clearly do not outweigh Plaintiffs' interest in being free from unlawful detention.  *See Francisco T. v. Bondi*, 797 F. Supp. 3d 970, 776 (D. Minn. 2025) ("[P]reventing unlawful detention is a compelling issue of public importance."); *cf. Advocs. for Hum. Rts. v. U.S. Dep't of Homeland Sec.*, Civ. No. 26-749, 2026 WL 404457, at *14 (D. Minn. Feb. 12, 2026) ("The Constitution does not permit the government to arrest thousands of individuals and then disregard their constitutional rights because it would be too challenging to honor those rights.").  Indeed, Defendants' enforcement of an expensive and expansive Refugee Detention Policy likely hinders Defendants' lawful pursuit of serious immigration violations.

The Court therefore concludes that both the balance-of-harm and the public interest factors weigh in favor of granting preliminary relief. The public's interest in protecting refugee rights will be advanced by preserving the status quo.

*　　　*　　　*

Accordingly, the *Dataphase* factors weigh in favor of granting preliminary injunctive relief.[33] Plaintiffs have shown that they are likely to succeed on their claim that Defendants' Refugee Detention Policy is unlawful under the Immigration and Nationality Act (specifically, 8 U.S.C. § 1159(a)(1)), the Constitution, and the APA; Plaintiffs have shown a significant threat of irreparable harm; and Plaintiffs have shown that the balance of harms as between the Plaintiffs and Defendants favors Plaintiffs. The Court will therefore grant preliminary injunctive relief and postpone the effective date of the Refugee Detention Policy under 5 U.S.C. § 705.[34]

---

[33] The Court waived the bond requirement under Federal Rule of Civil Procedure 65(c) in its January 28, 2026 TRO order. *See U.H.A.*, 2026 WL 222226, at *13. The Court will, out of an abundance of caution, waive the bond requirement for the purpose of this preliminary injunction because the preliminary injunction seeks to prevent constitutional violations and because Defendants would not incur monetary damages due to a wrongfully issued preliminary injunction. *See Liban G. v. Noem*, Civ. No. 26-301, 2026 WL 125689, at *3 n.1 (D. Minn. Jan. 16, 2026). This matter also implicates significant public interests. *See, e.g.*, *Richland/Wilken Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016).

[34] On January 20, 2025, President Trump issued an executive order, titled "Realigning the United States Refugee Admission Program." *See* Exec. Order No. 14163, 90 Fed. Reg. 8459 (Jan. 20, 2025). The order indefinitely suspended both "entry into the United States of refugees under the USRAP" and "decisions on applications for refugee status." *Id.* at 8459. The Court's conclusions regarding the lawfulness of Defendants' Refugee Detention Policy in Minnesota have no bearing whatsoever on the question of the lawfulness of President Trump's refugee suspension.

## V.    SCOPE OF RELIEF

The Named Plaintiffs bring claims on behalf of themselves as individuals and also on behalf of a putative class (and subclass) of similarly situated individuals under Federal Rule of Civil Procedure Rule 23(b)(2).  Plaintiffs seek to certify a "Class" defined as "[a]ll individuals with refugee status who are residing in the state of Minnesota, who have not yet adjusted to lawful permanent resident status and have not been charged with any ground for removal under the INA."  (Pls.' Mot. for Rule 23(b)(2) Class Cert. at 2.)  And Plaintiffs move to certify a "Detained Subclass," which consists of "[a]ll members of the Class who are or will be detained by DHS pursuant to the Refugee Detention Policy."  (*Id.*)

On January 28, 2026, the Court granted Plaintiffs' motion for a temporary restraining order, which, among other things, (1) required Defendants to immediately release all members of the putative Detained Subclass, and (2) prohibited Defendants from arresting or detaining any member of the putative Class solely because they are a refugee who has not yet obtained lawful permanent resident status.  *U.H.A.*, 2026 WL 222226, at *13.  The Court deferred ruling on Plaintiffs' class certification motion until the motion could be fully briefed and heard.  *Id.* at *10.  Although the Court deferred ruling on Plaintiffs' class certification motion, the Court evaluated whether temporary relief on a putative class-wide basis was appropriate using the framework set forth in Rule 23 of the Federal Rules of Civil Procedure.

Consistent with its TRO order, the Court will defer ruling on the class certification motion until that motion been fully briefed and argued.  The Court will, however, again

assess the propriety of class-wide preliminary injunctive relief by applying the framework set forth in Rule 23.

### A.     Standard of Review

"[C]ourts may issue temporary relief to a putative class." *Tincher v. Noem*, 164 F.4th 1097, 1099 (8th Cir. 2026) (quoting *A.A.R.P. v. Trump*, 605 U.S. 91, 98 (2025)).  In other words, the Court need not certify a class before issuing temporary injunctive relief that applies beyond the named parties to the present case. *A.A.R.P.*, 605 U.S. at 98 ("[W]e need not decide whether a class should be certified as to the detainees' due process claims in order to temporarily enjoin the Government from removing putative class members while the question of what notice is due is adjudicated.").  The Court will nevertheless address why preliminary injunctive relief for the putative class is justified, applying the criteria of Rule 23.

To certify a class, Plaintiffs must demonstrate compliance with Federal Rule of Civil Procedure 23.[35]  Rule 23 sets forth more than "a mere pleading standard." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).  Rather, Plaintiffs must provide evidentiary proof of each Rule 23 element. *Id.*  A court must conduct a "rigorous analysis" before certifying a class, which necessarily requires that the Court consider some issues that bear on the merits of a claim. *Id.* at 33–34.  But courts considering class certification are not expected

---

[35] Class actions in habeas cases are permitted in the Eighth Circuit.  *See Williams v. Richardson*, 481 F.2d 358, 361 (8th Cir. 1973).

to resolve questions regarding the merits. *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 459–60 (2013). First, Plaintiffs must show that they meet the requirements of Rule 23(a). *See generally* Fed. R. Civ. P. 23. Then, they must satisfy one of the three 23(b) categories. *Id.*

### B.    Rule 23(a)

A court considering whether to certify a class first assesses whether the class satisfies the requirements of Rule 23(a). *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1119 (8th Cir. 2005). These requirements are: (1) the class is so numerous that joinder of all members is impractical ("numerosity"); (2) there are questions of law or fact common to the class ("commonality"); (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class ("typicality"); and (4) the representative parties will fairly and adequately protect the interests of the class ("adequacy"). Fed. R. Civ. P. 23(a). The Court will address each prong in turn.

**First**, Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a). A putative class size of forty or more will generally support a finding of numerosity, but the Eighth Circuit has occasionally certified classes with less than forty members. *Portz v. St. Cloud State Univ.,* 297 F. Supp. 3d 929, 944 (D. Minn. 2018) (citing cases). The numerosity prong is easily satisfied as Operation PARRIS targets thousands of unadjusted refugees in Minnesota.

**Second**, Rule 23(a)(2) requires that there be questions of law or fact that are common to the class. Fed. R. Civ. P. 23(a)(2). To establish commonality under Rule

23(a)(2), class claims "must depend upon a common contention" that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The "commonality" element is clearly met here because the question of whether Defendants' policy of arresting and detaining refugees who have not yet obtained lawful permanent resident status is unlawful is a narrow, clear, common question of law or fact that applies equally to the Named Plaintiffs and the putative Class. Therefore, the legal issues presented are especially suited to class-wide resolution.

**Third**, Rule 23(a)(3)'s typicality requirement requires the Court to consider if the claims or defenses of the representative parties are typical of the claims or defenses of the class. Fed. R. Civ. P. 23(a)(3). To establish typicality, the Court must determine "whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982). Here, the same Refugee Detention Policy that likely infringes on the Named Plaintiffs' rights is equally poised to violate the rights of other class members, simply because the Refugee Detention Policy targets all lawfully present refugees in Minnesota who have not secured LPR status and subjects them to arrest and mandatory detention after being present in the United States for one year.

**Fourth,** the Court must decide whether the proposed representatives and counsel will "fairly and adequately protect the interests of the Class." Fed. R. Civ. P. 23(a)(4). The adequacy inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). After considering the limited record at this stage, the Court finds that this element is met as the Court is unaware of any conflicts of interest.

Accordingly, on the limited record before the Court, it seems probable that Plaintiffs will satisfy the criteria set forth in Rule 23(a).

### C.    Rule 23(b)

The Court must also decide whether the putative Class falls within one of the three categories of Rule 23(b). Rule 23(b)(2) is satisfied if a party shows that "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart Stores*, 564 U.S. at 360. The rule is particularly appropriate in civil rights actions seeking declaratory relief. *See Coley v. Clinton*, 635 F.2d 1364, 1378 (8th Cir. 1980). Here, Plaintiffs convincingly allege that Defendants have acted on grounds that apply generally to the putative Class by adopting a policy of targeting Minnesota's 5,600 unadjusted refugees for arrest and detention. *E.g., Mercado v. Noem*, 800 F. Supp. 3d 526, 564 (S.D.N.Y. 2025) (provisionally certifying Rule 23(b)(2) class of immigrants

detained by ICE, explaining that "defendants have acted on grounds generally applicable to the class—subjecting them to the same set of policies governing their confinement and access to attorneys—thereby making appropriate final injunctive relief with respect to the class as a whole").

Accordingly, the Court concludes that the Class is likely to be certified and that this matter is suitable for preliminary class-wide relief.

### D.     Defendants' Other Arguments

Defendants claim that class-wide preliminary injunctive relief is inappropriate. The Court is unpersuaded but will briefly address each of Defendants' arguments in turn.

**First**, Defendants argue that Court should not issue class-wide relief because there are too many factual issues. The Court disagrees. As discussed above, Plaintiffs seek to challenge a single policy—Defendants' Refugee Detention Policy—which applies equally to those who satisfy the putative Class definition. Because an injunction enjoining Defendants from enforcing the Refugee Detention Policy will provide relief to each putative class member, preliminary class-wide relief is appropriate. *See Wal-Mart Stores*, 564 U.S at 360 ("Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class.").

**Second**, Defendants argue that the Eighth Circuit's recent decision in *Tincher v. Noem*, 164 F.4th 1097 (8th Cir. 2026), forecloses temporary class-wide relief when the Court is not at risk of losing jurisdiction. This argument is unavailing. In *Tincher*, the Eighth Circuit stayed the District Court's preliminary injunction that barred federal officials from

retaliating against protesters opposing the government's immigration-enforcement initiative, Operation Metro Surge. *Id.* at 1098. The Eighth Circuit concluded that a stay was warranted because the putative class had *"no* chance of getting certified" and because the injunction was impermissibly vague. *Id.* at 1099. The Court finds *Tincher* to be readily distinguishable. Here, the putative class is far more likely to be certified for the reasons set forth above as well as those in the TRO Order. *See U.H.A.*, 2026 WL 222226, at *10–12 (analyzing the propriety of temporary class-wide relief under Rule 23). Indeed, *Tincher* itself acknowledged that "[c]ourts may issue temporary relief to a putative class." *Tincher*, 164 F.4th at 1099 (quoting *A.A.R.P.*, 605 U.S. at 98). Accordingly, the Court does not read *Tincher* to foreclose the putative class-wide relief the Court will grant here.

**Third,** Defendants argue that a preliminary injunction runs afoul of 8 U.S.C § 1252(f)(1), which places limitations on the Court's authority to issue injunctive relief. 8 U.S.C § 1252(f)(1) provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter [8 U.S.C §§ 1221–1232] . . . ." Defendants acknowledge that § 1159(a) is not among the statutes listed in § 1252(f)(1), but they argue that the preliminary injunctive relief is barred because § 1159(a) cross-references § 1225, which is included in part IV. The Court rejects Defendants' argument. Defendants' proposition contradicts

the plain text of § 1252(f)(1).  Moreover, as previously discussed, § 1225 does not apply to Plaintiffs.[36]

In short, the Court is unpersuaded by Defendants' claims that class-wide preliminary injunctive relief is inappropriate.

*        *        *

Under *A.A.R.P.*, formal certification is not required to grant preliminary relief to a putative class. 605 U.S. at 98.  But the Court's Rule 23 analysis above simply demonstrates that preliminary relief on a class-wide basis is appropriate.  Unlike the putative class in *Tincher*, the putative class in this case is likely to be certified.  Based on the Court's review of the *Dataphase* factors and its brief assessment of Rule 23's requirements, the Court will incorporate Plaintiffs' proposed class definition[37] and grant their motion for a preliminary injunction.  Because the putative Detained Subclass has been released pursuant to the Court's TRO order (*see U.H.A.*, 2026 WL 222226, at *13), the Court will not issue a preliminary injunction at this time as to the putative Detained Subclass.  The

---

[36] Additionally, § 1252(f)(1) in no way prohibits courts from setting aside unlawful agency actions under APA, which forms the basis of some of Plaintiffs' claims.  *See Garland v. Aleman Gonzalez*, 596 U.S. 543, 571 (2022) (Sotomayor, J., concurring in part) ("[T]he Court does not purport to hold that § 1252(f)(1) affects courts' ability to 'hold unlawful and set aside agency action, findings, and conclusions' under the Administrative Procedure Act." (citing 5 U.S.C § 706(2))).

[37] All individuals with refugee status who are residing in the state of Minnesota, who have not yet adjusted to lawful permanent resident status and have not been charged with any ground for removal under the Immigration and Nationality Act.

Court will therefore grant preliminary injunctive relief only for the putative Class, as detailed in the Order section, below.

## VI.   STAY PENDING APPEAL

Finally, Defendants' request that the preliminary injunction be stayed pending appeal if the Court grants Plaintiffs' motion.  Courts consider four factors when assessing whether to issue a stay pending appeal:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken*, 556 U.S. at 434 (cleaned up).  In light of the "substantial overlap" with the *Dataphase* factors and the Court's conclusions that the *Dataphase* factors weigh in favor of granting preliminary injunctive relief, a stay is not warranted.  *See id.*  Defendants' request for a stay pending appeal will therefore be denied.

## CONCLUSION

The Government's actions in this case beg the question: Why?  Why would our Government adopt a policy under which refugees—who have been thoroughly vetted, lawfully admitted to the United States, and resettled in communities with Government support—are subject to arrest and detention the moment that one year has passed since their lawful arrival?  Why subject them to warrantless arrests, place them in shackles, and transport them to distant detention facilities—facilities whose conditions likely resemble the refugee camps they once lived in—simply to conduct the required one-year interview

that precedes adjustment to lawful permanent resident status?  Why?  The Government suggests that they are looking for terrorists, but there is not a shred of evidence in the record that the Named Plaintiffs or the putative Class they seek to represent pose serious national security risks.  The Government suggests that prior Administrations did not vet refugees thoroughly enough.  But again, there is no evidence in the record or elsewhere that suggests that prior Administrations were deficient in evaluating refugees for admission.

Refugees are not illegal immigrants who have crossed our borders without permission.  Refugees are thoroughly vetted before being offered conditional admission to the United States.  The refugees covered by this injunction have not been charged with any ground of removability, nor is there reason to believe that they would evade the interview and inspection required to obtain lawful permanent resident status.  The Government has offered no legitimate rationale or legal authority to justify their indefinite detention.

The Court holds that 8 U.S.C. § 1159(a)(1) does not authorize federal authorities to arrest and detain refugees who have lived in the United States for more than a year, have not yet adjusted to lawful permanent resident status, and have not been charged with any ground of removability.  The Government's startling theory—that the statute silently grants DHS the power to seize a refugee the moment the clock strikes midnight on the 366th day after admission—is wrong.  This theory finds no support in the text, the history,

or the purpose of § 1159(a)(1) and marks a sharp break from more than four decades of agency practice.  Section 1159(a)(1) did not confer such authority in 1980, and it does not confer it now.

In the Refugee Act, this Nation extended a helping hand to those escaping persecution.  We made a simple promise: pass the vetting, follow the law, and you will be given a chance at a new beginning in safety.  That promise was not symbolic.  It was concrete.  It meant the opportunity to work, to worship, to raise children without fear, and to build a future under the protection of American law.  Stability—not more fear— was the commitment.

The Government's proposed new interpretation upends that commitment without clear authorization from Congress and rests on constitutionally precarious grounds.  Defendants seek to transform a system built on promised opportunities and freedom into one of uncertainty and indefinite confinement.  Until the legality of this dramatic shift is addressed at trial, the Court will not allow those who relied on this Nation's promise of safety to be met instead with handcuffs.  The Constitution requires steadiness, fidelity to statute, and respect for promises made.  The rule of law demands no less.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiffs' Motion for Preliminary Injunction (Docket No. [16]) is **GRANTED in part and DENIED in part**, as follows:

1. For the purposes of this Order, preliminary relief is **GRANTED** to a putative "**Class**" which encompasses: "All individuals with refugee status who are residing in the state of Minnesota, who have not yet adjusted to lawful permanent resident status, and have not been charged with any ground for removal under the Immigration and Nationality Act."

2. Defendants are **ENJOINED** from arresting or detaining any member of the **Class** on the basis that they are a refugee who has not been adjusted to lawful permanent resident status.

3. For the purposes of this Order, preliminary relief is **DENIED without prejudice** as to the putative "**Detained Subclass**" which encompasses: "All members of the Class who are or will be detained by DHS pursuant to the Refugee Detention Policy."

4. The effective date of the Refugee Detention Policy in Minnesota is postponed pursuant to 5 U.S.C. § 705.

5. Plaintiffs are not required to provide security under Federal Rule of Civil Procedure 65(c).

6. This Order is effective upon the date recited below and shall remain in effect until this action is terminated or until otherwise ordered by the Court.

DATED: February 27, 2026
at Minneapolis, Minnesota.

_____
JOHN R. TUNHEIM
United States District Judge